No. 89-531

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

IN RE THE MATTER OF DECLARING
B.H.M., C.M.M. and J.T.H.,
Youths in Need of Care.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Leif Erickson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Chris P. Christensen, Kalispell, Montana
Paulette C. Ferguson, Missoula, Montana, (Attorney
for Maternal Grandmother)

For Respondent:

Ted O. Lympus, County Attorney, Randy K. Schwickert,
Deputy County Attorney, Kalispell, Montana; Marc
Racicot, Attorney General, Elizabeth L. Griffing,
Assistant Attorney General, Helena, Montana
Robert B. Allison, Kalispell, Montana (Attorney for
Youths)

Submitted: July 13, 1990

Decided: October 25, 1990

Filed:

FILED
'90 OCT 25 AM 11 25
ED SMITH, CLERK
MONTANA SUPREME COURT

Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.

Appellant Doreen Karen Howard appeals from the order of the District Court, Eleventh Judicial District, County of Flathead, which terminated her parental rights to BHM, CMM, and JTH, who had previously been designated youths in need of care. We affirm.

The issues presented on appeal are:

1. Whether the District Court followed proper procedural steps in terminating the parental rights of the appellant.

2. Whether the District Court erred in considering the "best interests of the child" test in terminating the parental rights of appellant.

3. Whether there was sufficient evidence presented to support the District Court's order.

BHM, born on August 26, 1982, and CMM, born on September 17, 1983, are children of appellant and Dan Moe, deceased. JTH, born on July 1, 1985, is the child of appellant and Mark Rickman.

Dan Moe was murdered on July 31, 1985. Mark Rickman pled guilty to this murder on March 21, 1986. Rickman was sentenced to 35 years in prison.

At the March 21 hearing, Rickman testified that appellant and appellant's mother, Opal Howard, had assisted in the homicide. As a result, appellant was arrested on March 19, 1986, and subsequently pled guilty to obstructing justice by helping Rickman dispose of Dan Moe's body. Appellant was sentenced to ten years in prison.

2

After appellant was arrested for her participation in the murder and incarcerated in Flathead County, a petition for Temporary Investigative Authority (TIA) was filed with the District Court seeking protective services for her three children. The supporting affidavit stated that both appellant and the natural father of JTH were currently incarcerated and the natural father of BHM and CMM was deceased. The court granted the TIA on March 21, 1986. As a result, the children were removed from their home and placed in foster care with non-relatives.

On April 4, 1986, Opal Howard moved to dismiss and vacate the order granting the TIA. An adjudicatory hearing was held on April 9, 1986. At this hearing, Shawn Trontel, a psychiatric social worker, testified that BHM, who was three and one-half years old, showed behavior more appropriate to a two-year-old. His speech was basically unintelligible. He was withdrawn and fearful. He was not toilet-trained and showed fears of toilet training. He was unable to form attachments to other persons and was unable to follow simple directions. CMM was not toilet-trained and lacked skills associated with a child of her age. The children were unable to feed themselves with utensils and drank from "tippy" cups.

Mark Rickman testified at this hearing concerning the involvement appellant and her mother, Opal, had in the murder of Dan Moe. He testified that the murder was planned to prevent the children from having contact with their father and his family. Further, he testified that his participation in the murder was

3

compelled by threats from Opal and appellant that he would lose contact with his son, JTH. Neither appellant nor Opal refuted this testimony. The court denied the motion to dismiss and the children were initially adjudicated youths in need of care. The involvement of their mother in the murder of Dan Moe had a detrimental impact on the children's mental and physical health.

As part of the court's order, all of the potential caregivers underwent psychological evaluations and submitted to home studies. After reviewing these evaluations and home studies, the Flathead County Department of Public Welfare (Department) attempted to transfer the placement of BHM and CMM to Pat and Karen Moe, the children's paternal aunt and uncle, and the placement of JTH to Duane and Karen Wock, the maternal aunt and uncle. The Department justified this request based upon the positive feelings that the children, BHM and CMM, had for Pat and Karen, and the idea that the longer the children stayed in foster care, the more difficult it would be if an eventual break occurred.

Appellant obtained a temporary restraining order to prevent the transfers because the Department had failed to first contact appellant. Opal Howard filed a formal notice withdrawing herself from consideration as an alternate caretaker for the children. This notice was based upon her objection to the general release of her psychological evaluation.

A hearing was held in November, 1986, to determine whether a permanent injunction should issue preventing the transfer of the children. At this hearing, the court heard substantial evidence

4

regarding BHM and CMM's improvement after a two-week visit with their aunt and uncle, Pat and Karen Moe. Their preschool teacher testified that after the visit they seemed like new children. Two social workers who had had contact with the children recommended that they be placed with family members.

On November 21, 1986, the court found that it was in the best interests of BHM and CMM to be placed with Pat and Karen Moe, and for JTH to be placed with Duane and Theresa Wock. The court recognized the animosity between the Howards and the Moes, and ordered that Pat Moe obtain counseling and admonished the Moes not to make any deprecatory statements about the children's mother. The court also ordered that the placements be regularly monitored.

In a report dated February 10, 1987, social worker Donna Taylor noted that BHM and CMM were doing well in the Moes care but that JTH should be removed from his placement at the request of the Wocks. Upon motion by the State, the court ordered that JTH be placed in the home of his maternal aunt and uncle, Dan and Eileen Howard.

In November, 1988, the Department filed a petition for permanent custody and authority to consent to adoption with the court. On February 1, 1989, Opal Howard moved to intervene and filed a petition for custody of the children. On February 17, 1989, Mark Rickman filed notice that he would not contest the termination of his parental rights.

A hearing was conducted on February 21-24 and May 16-17, 1989. At the hearing, at least six professionals testified as to the

fragile emotional condition of the oldest child, BHM; the children's improvement after being placed in foster care; and appellant's incapacity to care for dependent children on a long term basis.

Based upon the evidence presented at the hearing, the District Court concluded that the children had been abused and neglected, and were youths in need of care. The court further concluded that the parental rights of appellant should be terminated because her conduct and condition were unlikely to change within a reasonable time. Finally , the court concluded that the best interests of the children would be served by termination of the parental rights; and by an award of permanent legal custody to the Department with authority to consent to adoption of the children.

The first issue is whether the District Court followed proper procedure in terminating the parental rights of the appellant

Two procedures culminated in the District Court's finding that appellant's parental rights should be terminated. The first one was the District Court's grant of temporary investigative authority (TIA) and protective services pursuant to a Department petition, governed by §§ 41-3-401 through 409, MCA. The second was the final termination of rights, governed by §§ 41-3-601 through 612, MCA.

The primary issue before this Court is whether the District Court acted arbitrarily in terminating the mother's parental rights permanently, not whether the District Court acted improperly in accepting the recommendation of the Department for temporary authority. Assuming, nevertheless, that Doreen Howard may

6

challenge the Department's grounds for the TIA and the temporary transfer of the children from foster care to the Moe home, a review of the record shows that the District Court adhered to the proper statutory procedures.

The Department was well within its bounds when it filed a petition for temporary custody. Section 41-3-402(1), MCA, states:

In cases where it appears that a youth is abused or neglected or is in danger of being abused or neglected, the county attorney, attorney general, or an attorney hired by the county welfare department or office of human services may file a petition for temporary investigative authority and protective services.

The District Court received a petition for temporary investigative authority and protective services filed pursuant to §§ 41-3-401 (10) and 41-3-402, MCA. The court issued an order pursuant to § 41-3-403, MCA, which expressly allows the court to grant such relief as may be required for the immediate protection of the youth. The mother and grandmother then moved to vacate the order and dismiss the petition. A hearing was held on April 19, 1986, to decide on the motion. From the evidence as set forth in the record, the District Court found probable cause to support the TIA petition.

Appellant contends that the grant of the TIA and the subsequent transfer of the children from neutral foster care to the Moe home was based only on the absence of the parents; she maintains that abuse or neglect within the mandate of the statute was never alleged. However, the statute provides that danger of abuse or neglect is adequate grounds for issuing a TIA. It is

7

certainly within the contemplation of an agency or judicial body that the violent death of one parent and the incarceration of another could place children in danger of psychological and emotional trauma. That the children's mother was alleged to have participated in perpetrating this trauma rises to the level of at least neglect, if not abuse. The District Court found, after subsequent psychological testing, that at least one of the children exhibited distress and fear at the thought of going back to live with his grandmother.

The findings of a district court on abuse and neglect generally will not be disturbed "unless a mistake of law exists or the factual findings are not supported by substantial evidence." In the Matter of J.L.S. and A.D.S., Youths in Need of Care, 234 Mont. 201, 206, 761 P.2d 838, 841 (1988). The term "neglect" includes emotional deprivation. Matter of JLB, 182 Mont. 100, 114, 594 P.2d 1127, 1135 (1979). The mother's complicity in the homicide, coupled with the results of the psychological testing, could prompt a condition of emotional deprivation. Clearly the District Court was within its discretion in granting the state temporary investigative authority. Having determined that the TIA was properly granted, we now turn to the issue of permanent termination.

The proper procedure for permanent termination is outlined in § 41-3-609, MCA, which states in part:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that the circumstances contained in subsection (1)(a), (1)(b), or (1)(c), as follows, exist:

8

. . . (c) the child is an adjudicated youth in need of care and both of the following exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

The District Court properly found, first, that the children were "youth in need of care" as defined in § 41-3-603(2), MCA. "Youth in need of care" means a youth who is dependent, abused, or neglected as defined in § 41-3-102(2). Section 41-3-102(2), MCA states:

"Abused or neglected child" means a child whose normal physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare.

Substantial evidence was presented regarding the children's abuse or neglect at both the TIA proceeding and the 1989 permanent custody hearings. They were thus adjudicated "youth in need of care" as the first criterion of § 41-3-609, MCA, requires. The final two criteria that must be met under § 41-3-609, MCA, are: 1) that a treatment plan has not been successful and 2) that the condition of the parent(s) is not likely to change within a reasonable amount
of time.

Appellant argues that under § 41-3-609(1)(c)(i), MCA, an "appropriate treatment plan" was never authorized by the court; the only plan attempted was one by which to evaluate appellant's probable success with a treatment plan, and to then propose an appropriate plan. She states that her due process rights were

9

violated because a complete treatment plan was never attempted.

Although the District Court did approve a preliminary "treatment plan" for appellant in order to determine her chances of success in thorough treatment, it was not required to do so.

Subsection (4) of 41-3-609, MCA, reads:

A treatment plan is not required under this part upon a finding by the court following hearing if: (b) the parent is incarcerated for more than 1 year and such treatment plan is not practical considering the incarceration . . .

While it is unclear from the District Court's findings whether it was proceeding under § 41-3-609(1)(c)(9), MCA requiring proof of an unsuccessful treatment plan, or under § 41-3-609(4), MCA, not requiring any plan at all, we conclude that there is sufficient evidence in the record to justify the District Court's decision to terminate. A lengthy hearing was held in February of 1989, and continued in May of 1989, in which the practicality of a treatment plan was discussed, as well as the benefit to the children of permanent alternate placement. Appellant was given an opportunity to testify at this hearing. In spite of her testimony, the District Court found that a treatment plan would not be practical because of the mother's deficiencies and the length of her prison sentence. Appellant's argument that the court did not comply with the requirements of § 41-3-609(1), MCA (requiring the treatment plan) is without merit. In meeting the requirements of § 41-3-609(4) (the exception to the treatment plan rule), the court provided due process by fulfilling all of the requirements for permanent termination of parental care. Further, adequate evidence

10

was presented to indicate that appellant's condition was unlikely to change within a reasonable amount of time as required by § 41-3-609(1)(c)(ii), MCA.

The second issue is whether the District Court abused its discretion by considering the best interests of the children in terminating parental rights.

Appellant contends that the District Court's finding of fact no. 51 and conclusion of law no. 5, erroneously use the "best interest of the children" standard in terminating her parental rights. She further argues that the State is using parental deficiencies alone to justify the termination of parental rights. We disagree.

The case law that appellant cites clearly states that the "best interests" test is properly used after an initial finding of dependency, abuse, or neglect. Matter of Guardianship of Doney, 174 Mont. 282, 286, 570 P.2d 575, 578 (1977); Matter of Fish, 174 Mont. 201, 206, 569 P.2d 924, 927 (1977); In Re Gore, 174 Mont. 321, 327, 570 P.2d 1110, 1113 (1977); Matter of Guardianship of Aschenbrenner, 182 Mont. 540, 549, 597 P.2d 1156, 1162 (1979). Here the court has met the threshold requirement by finding the children "youth in need of care"; their status as such satisfies the prerequisites for the "best interests" test. Further, this Court has previously stated that "when parents commit acts which deprive a child of an adequate physical and emotional environment, the best interest of the child becomes paramount over parental rights." In the Matter of J.L.S. and A.D.S., Youths in Need of

Care, 234 Mont. 201, 208, 761 P.2d 838, 842 (1988). While the "best interests" test is specifically applied after termination in order to determine proper placement for the children, it is also used as a guideline throughout proceedings once an unacceptable home environment has been ascertained.

Appellant's argument that it is her parental deficiencies alone that are justifying termination is equally without merit. Finding of fact no. 51 cites a variety of factors to justify the court's decision, including the needs of the children, the history of violent behavior by the parents, and the long term confinement of the parents. These are all factors that the court "shall" consider pursuant to § 41-3-609(2), MCA. The District Court has considered the children's whole situation, as the statute mandates, and was well within its discretion in its final decision.

The third issue is whether sufficient evidence was presented to support the District Court's order.

Appellant presents testimony from members of various communities where the family lived that the children seemed to be physically well cared for and not unusually ill-behaved. The District Court, however, found the respondent's evidence persuasive that at least some of the children were abused, neglected and/or deprived. At least one of the children had speech and developmental problems, and showed indications of being subject to physical abuse. They were not toilet trained. They exhibited substantial emotional improvement after removal from the home and

placement in foster care.   The record does not reflect any abuse of discretion on the part of the District Court.

The judgment is affirmed.

_William E. Hunt, Sr._
Justice

We Concur:

_John Conway Harrison_

_Diane G. Barz_

_R. C. McDonough_

_[signature]_
Justices