No. 01-798

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 180

_____

IN THE MATTER OF F.M. and D.M.,

       Youths in Need of Care.

_____

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                  In and for the County of Ravalli,
                  Honorable Jeffrey H. Langton, Judge Presiding

COUNSEL OF RECORD:

        For Appellants:

                Charles E. Umhey III, Attorney at Law, Hamilton, Montana (For Father)

                Dustin L. Gahagan, Waters & Gahagan, Hamilton, Montana (For Mother)

        For Respondents:

                Honorable Mike McGrath, Attorney General; Mark W. Mattioli, Assistant Attorney General, Helena, Montana

                Michael L. Hayes, Hays & Hayes, Hamilton, Montana

_____

                        Submitted on Briefs:  May 30, 2002

                                 Decided:  August 22, 2002

Filed:

                _____
                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Tina and Vernon, mother and father of F.M. and D.M. (collectively, the children), appeal from the Findings of Fact, Conclusions of Law, and Judgment entered by the Twenty-First Judicial District Court, Ravalli County, terminating their parental rights to F.M. and D.M., and awarding permanent care, custody and control with authority to assent to adoption or another permanent custody arrangement to the Montana Department of Public Health and Human Services (Department). We affirm.

¶2 We rephrase the issues on appeal as follows:

¶3 **1. Did the District Court err in determining that F.M. and D.M. were youths in need of care in regard to Vernon?**

¶4 **2. Did the District Court err in determining that the criteria of § 41-3-609, MCA, were met by clear and convincing evidence when terminating the parental rights of Tina?**

*BACKGROUND*

¶5 Tina and Vernon are the natural parents of F.M. and D.M., born on May 24, 1993, and February 12, 1998, respectively. The Department first became involved with the family in October 1997, after receiving referrals of physical and emotional abuse and neglect of F.M. by both parents and of sexual abuse of F.M. by a third party.

¶6 The Department petitioned for temporary investigative authority (TIA) on October 12, 1999. Both Vernon and Tina were present at the October 27, 1999, hearing. During the hearing, the Department presented testimony from social worker Kim Davis that it had received thirteen different referrals in the previous two years

2

in addition to evidence of physical and verbal abuse, neglect, sexual molestation of F.M., poor school attendance, head lice and a threat by Vernon to burn F.M.'s bedroom.

¶7 The District Court also received evidence from the children's case manager, Jennifer Boehmke, that F.M. was severely emotionally disturbed and suffered from post-traumatic stress disorder related to her sexual molestation. Tina testified at the hearing, admitting that F.M. had missed school because of head lice, that F.M. had been sexually abused while in her care, and that she and Vernon allowed F.M. to be alone in a car with the abuser after F.M. reported the abuse. Vernon was present but did not testify at the hearing.

¶8 Based upon the foregoing evidence, the District Court determined that probable cause existed that the children were abused and neglected. It thus granted temporary investigative authority and ordered the children removed from Tina's home and placed in foster care.

¶9 On November 8, 1999, Rhonda Harris (Harris), a social worker for the Department, conducted an introductory meeting with Tina and Vernon. Harris informed Tina and Vernon what the Department would require in order for them to regain custody of their children, suggested parenting classes and counseling for both parents and anger management counseling for Vernon. According to Harris' testimony, both understood what the Department expected of them.

¶10 Vernon and Tina subsequently participated in five scheduled visitations with the children through December 15, 1999. Because

3

Comment [COMMENT1]: Trans. 102

Comment [COMMENT2]: Trans. 104

Tina and Vernon broke up shortly thereafter, Vernon moved out of Tina's home and requested individual visitation with the children, apart from Tina. The Department granted Vernon's request and scheduled a separate visitation time for January 19, 2000. Although Vernon knew of the scheduled visitation, he did not show up or call to explain why he was not present, nor did he thereafter request further visitation with his children. Despite telling Harris that he would keep in contact with his current address and phone number, Vernon did not again contact the Department to inform anyone of his current residence or general whereabouts for the duration of the proceedings.

¶11 The Department petitioned to extend its TIA on January 25, 2000. Service of the summons on both Tina and Vernon was successful, as Vernon was located at Tina's residence on February 3, 2000. The District Court held a hearing on the Department's petition on March 6, 2000, and extended the Department's investigative authority an additional 90 days.

¶12 On June 5, 2000, the Department petitioned for temporary legal custody and the District Court set a hearing date of July 5, 2000. Tina was served with a notice of the petition and was present at the hearing. The Department was unable to serve notice to Vernon, however, as the Department had not been informed of his whereabouts since his last visitation in December 1999, and Vernon had not complied with the District Court's order granting the extension of temporary investigative authority, which required that Vernon provide the Department with information regarding any changes of

4

Comment [COMMENT3]: Trans. 102-103.

Comment [COMMENT4]: Trans. 160

address or phone numbers. According to the affidavit submitted by Harris in support of the petition for temporary legal custody, Tina told her and the Foster Care Review Committee on March 16, 2000, that Tina had no knowledge of Vernon's whereabouts and believed that he had either moved to California or to Texas. The record reflects that the Ravalli County Sheriff was unable to locate Vernon and personally serve him with a notice of the hearing.

¶13 At the July 5, hearing, Tina stipulated to temporary legal custody and the District Court entered its order on July 18,[1] granting the Department's petition, finding F.M. and D.M. to be youths in need of care with respect to Tina, and approving a treatment plan for her. Tina's treatment plan required, in part, that she continue individual counseling with Dr. Carol Blum, participate in group sessions for domestic violence counseling and training, participate twice a month with the Child Development Center (CDC) to learn how to better care for D.M., who was severely developmentally delayed, and meet on a regular basis with F.M.'s therapist to understand F.M.'s therapeutic needs and the recommended parenting techniques needed to parent F.M. Another

> **Comment [COMMENT5]:** Trans. p. 12

---

[1] In Findings of Fact #10 and #11 in the District Court's May 1, 2001, termination order, the District Court erroneously refers to its July 5, 2000, hearing as the "July 18, 2000, hearing"-- July 18 being the *filing* date of the subsequent order. Vernon's brief on appeal repeats this error. Rather than refer to the erroneous dates as argued, we will correctly make reference to the "July 5 hearing" and "July 18 order" respectively.

restriction placed on Tina was that she was expected to refrain from contact with Vernon during her treatment plan because of his history of verbal and physical abuse toward her and the children.

¶14 The District Court continued the hearing with respect to Vernon and ordered that he be served with the summons via publication in the *Ravalli Republic* for the purpose of notifying him of the hearing and presenting him with a treatment plan. The *Ravalli Republic* is a newspaper published in Hamilton, Montana, and designated by the District Court as the newspaper most likely to give notice to Vernon.

¶15 Vernon's summons was subsequently published in the *Ravalli Republic* for three successive weeks from July 21, 2000, through August 4, 2000. No response was received from Vernon by the August 16, 2000, hearing date. Harris testified at the hearing that the Department had not had any contact with Vernon since the March 2000 hearing and did not know of his whereabouts. The District Court appointed an attorney to represent Vernon's interests as separate from Tina's, should Vernon be located by or have contact with the Department. The District Court then entered an order granting the petition for temporary legal custody as to Vernon, stating: "Based upon the record herein and the testimony presented, the Court finds no reason to disturb its previous adjudication of the youths as Youths in Need of Care." The District Court approved and ordered a treatment plan, requiring in part, that Vernon enroll and participate in anger management counseling, complete a psychological evaluation, participate in bi-monthly visitation with

6

Comment [COMMENT6]: Aug. 16, 2000, Trans. p. 5

his children, remain in regular contact with the Department and participate in paternity testing.

¶16 Because of Vernon's absence during much of the proceedings and the fact that he did not contact the Department or provide his address or phone number, the Department never had the opportunity to present Vernon with a copy of the treatment plan or to personally work with him to complete the requirements of the plan.

¶17 Despite Tina's March 16, 2000, statement that she did not know of Vernon's whereabouts and that he may be in either Texas or California, Harris' testimony reflected that Vernon remained in the Hamilton and Missoula area through much or most of the proceedings. Harris testified to the following:

> My records show that on February 23rd of 2000, he appeared here in court; on March 6th of 2000, he appeared here in court; and March 17th of 2000, I observed him driving in the same vehicle with Tina in Missoula; on March 28th of 2000, I found [Vernon] in the closet at Tina's house; on May 15th, 2000, the foster mom reported that . . . she had seen Vern and Tina together at the grocery store; on May 29th of 2000, another member in our office had seen Tina and Vern at a local hardware store together; on October 23rd of 2000, another social worker saw Vern at Tina's home; on 12/20 of 2000, I again found Vern in a box in Tina's closet; on January 9th of 2001, I observed Vern coming out of Tina's residence and then going back in; and on April 2nd, 2001, Vern attended a family group conference in Family Services' office.

Comment [COMMENT7]: Trans. p. 106

¶18 On cross-examination, Tina verified some of Harris' accounts and admitted to lying to the Department about not spending time with Vernon. Tina further admitted lying to the Department in March and December 2000, regarding Vernon's whereabouts and the presence of Vernon in her home.

¶19 The Department filed its Petition for Permanent Legal Custody on January 18, 2001. The Sheriff's return of service reflects that

Vernon was served with notice of the Department's petition at Tina's residence on February 2, 2001.

Comment [COMMENT8]: Trans. p. 107

¶20  The District Court held hearings on the Petition from April 17 through 24, 2001, and entered its Order on May 3, 2001, terminating Tina's and Vernon's parental rights, concluding that, pursuant to § 41-3-609(1)(f), MCA (1999),[2] Tina and Vernon failed to successfully complete their respective, court-approved treatment plans, and that the conduct of Tina and Vernon rendering them unfit is unlikely to change within a reasonable time.  Tina and Vernon now appeal.

*STANDARD OF REVIEW*

¶21  "In reviewing a decision to terminate parental rights, this Court determines whether the district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct."  *In re A.C.*, 2001 MT 126, ¶ 20, 305  Mont. 404, ¶ 20, 27 P.3d 960, ¶ 20 (citation omitted).  A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or, if after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake.  *In re A.M.*, 2001 MT 60, ¶ 33, 304 Mont. 379, ¶ 33, 22 P.3d 185, ¶ 33 (citation omitted). This Court will not disturb a district court's findings on abuse and neglect "unless a mistake of law exists or the factual findings

---

[2]  Unless otherwise indicated, all statutes referenced here are those found under Montana's 1999 codes, which were those in force at the time this matter was adjudicated by the District Court.

8

are not supported by substantial evidence." *In re B.H.M.* (1990), 245 Mont. 179, 184, 799 P.2d 1090, 1093-94 (citation omitted).

¶22  It is well-established that a natural parent's right to care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures at all stages of the proceedings. *In re A.F.-C.*, 2001 MT 283, ¶ 31, 307 Mont. 358, ¶ 31, 37 P.3d 724, ¶ 31 (citation omitted).  Additionally, when considering the criteria for termination of parental rights, courts must give primary consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional needs.  *In re M.W.*, 2001 MT 78, ¶ 4, 305 Mont. 80, ¶ 4, 23 P.3d 206, ¶ 4 (citation omitted).

*DISCUSSION*

¶23  **Did the District Court err in determining that F.M. and D.M. were youths in need of care in regard to Vernon?**

¶24 Vernon argues that the District Court did not properly adjudicate the children as youths in need of care in regard to him and, therefore, that the District Court's determination in its termination order that it had done so is clearly erroneous, requiring reversal of the termination order.

¶25 At the July 5, 2000, temporary legal custody hearing, the District Court received Tina's stipulation that the children were youths in need of care in regard to her, but because of Vernon's absence, continued the hearing in regard to him until August 16, 2000, subsequent to providing him notice of the hearing via publication in the *Ravalli Republic*.

¶26 After the August 16 hearing, the District Court entered its order stating that "[b]ased on the record herein and the testimony presented, the Court finds no reason to disturb its previous adjudication of the youths as Youths in Need of Care." Vernon does not object to the service via publication, but objects to the District Court's August 16 adjudication for two reasons: first, because of the District Court's alleged reliance on Tina's stipulation at the July 5 hearing as evidence of abuse and neglect in regard to Vernon; and second, because the District Court allegedly relied upon and received improper and insufficient evidence at the August 16 hearing, and thus could not make a finding of abuse and neglect by a preponderance of the evidence as required by § 41-3-404, MCA. In this regard, Vernon asserts that, in adjudicating the children as youths in need of care in regard to him, the District Court relied on testimony at the August 16 hearing regarding conditions from an agreed upon parenting plan in Tina and Vernon's dissolution of marriage. Vernon argues that it would violate fundamental principles of fairness to use a condition from the parenting plan in a dissolution of marriage action to constitute proof of an element in an abuse and neglect proceeding.

¶27 Vernon explains that a finding of abuse and neglect by a preponderance of the evidence is a jurisdictional prerequisite to terminate the parent-child relationship pursuant to § 41-3-609(1)(f), MCA. Vernon thus contends that the District Court did not retain jurisdiction to terminate his parental rights, and that

10

its May 1, 2002, order terminating his parental rights is therefore in error.

¶28 The Department responds that the District Court received substantial evidence at the show cause hearings on the Department's TIA petitions and at the permanent legal custody hearing to properly adjudicate the children as youths in need of care. The Department emphasizes that, prior to disappearing for an extended period, Vernon appeared at the initial show cause hearing and the hearing on the extension of the TIA. The Department argues that the District Court not only received sufficient evidence to adjudicate the children as youths in need of care, but that it did, in fact, state that the children were youths in need of care at both TIA hearings and in its order terminating Vernon's parental rights. The Department argues, therefore, that the District Court's determination that the children were youths in need of care at either the show cause or permanent legal custody hearings is sufficient to support termination of Vernon's parental rights.

¶29 As correctly noted by Vernon, a threshold requirement for termination of parental rights under § 41-3-609(1)(f), MCA, is the proper adjudication of the children as youths in need of care. Thus, a district court cannot obtain jurisdictional authority to award the Department permanent legal custody absent such proper adjudication pursuant to the hearing mandated by § 41-3-404, MCA. See *In re M.W.*, ¶ 46 (citing *In re J.B.* (1996), 278 Mont. 160, 164, 923 P.2d 1096, 1099); *In re M.J.W.*, 1998 MT 142, ¶ 11, 289 Mont 232, ¶ 11, 961 P.2d 105, ¶ 11.

11

¶30 We therefore disagree with the Department's assertion that the adjudication of the children as youths in need of care can be properly established based upon evidence received at the hearing on permanent legal custody. Rather, to retain jurisdiction to terminate parental rights pursuant to § 41-3-609(1)(f), MCA, the district court must, in the temporary legal custody stage, find by a preponderance of the evidence that the child is abused or neglected. Section 41-3-404, MCA; *In re A.M.*, ¶ 44; *In re M.J.W.*, ¶ 12.

¶31 In its subsequent termination order, the district court must conclude that it did not exceed its jurisdiction at any time during the course of the proceedings. "[T]he decisive first question is: does the record show that during the course of the parental rights termination proceedings the State offered clear and convincing evidence that the District Court correctly adjudicated [the children as youths] in need of care under the governing statutes?" *In re A.M.*, ¶ 46. Thus, if the district court does not make a proper finding of abuse and neglect by a preponderance of the evidence pursuant to § 41-3-404, MCA, it will have exceeded its jurisdiction in waiting to make such determination until terminating parental rights pursuant to § 41-3-609(1)(f), MCA.

¶32 We thus turn to Vernon's initial argument that the District Court erred in relying on evidence adduced from the July 5 hearing wherein Tina stipulated that the children were youths in need of care. Citing to this Court's decision in *In re M.W.*, 2001 MT 78, 305 Mont. 80, 23 P.3d 206, Vernon asserts that the District Court

12

improperly inferred that its earlier adjudication that the children were youths in need of care in regard to Tina, was sufficient to find abuse and neglect regarding him, and given the fact that he received no notice of the hearing and did not have the opportunity to be heard, he was denied due process.

¶33 In *In re M.W.*, the district court adjudicated the children youths in need of care only in regard to the father because the State failed to notify the mother of the hearing. *In re M.W.*, ¶ 7. The State argued that the adjudication of the children as youths in need of care in regard to the father would be sufficient for the purpose of terminating the mother's parental rights, but we disagreed and reversed, holding that adjudication of the children as youths in need of care in regard to the father did not adjudicate the children as youths in need of care in regards to the mother. *In re M.W.*, ¶ 49.

¶34 However, *In re M.W.* is not dispositive of the instant case. The Department has not argued that the District Court's finding of abuse and neglect regarding Tina applied to Vernon. Rather, it argues that the District Court received sufficient evidence to adjudicate the children as youths in need of care at the TIA hearings and that the District Court did, in fact, adjudicate the children youths in need of care at both TIA hearings in regard to Vernon. Furthermore, the record does not reflect that the District Court made a determination of abuse and neglect in regard to Vernon on the basis of Tina's stipulation nor based upon anything in

13

relation to the July 5 hearing. Thus, Vernon's allegation of a due process violation based thereon is without merit.

¶35 Likewise, the record does not reflect, as Vernon asserts in his second argument, that the District Court at the August 16 hearing made a determination of abuse and neglect based upon the parenting plan from Tina and Vernon's dissolution or upon "insufficient" evidence adduced at this hearing. Rather, the District Court received testimony from Harris that the Department had not had contact with Vernon since the second TIA hearing. Harris testified that, in addition to having no contact with Vernon, he had not obtained the intensive parenting training nor the training for anger management as ordered by the District Court in its order of March 7, 2000, an order of which Vernon was aware. Harris testified that Vernon had not completed the recommended family counseling nor the recommendations made by the CDC, as Vernon was not aware of the recommendations made by the CDC. Harris also testified to having a treatment plan prepared for Vernon that was geared toward preserving his parental rights as they existed before the Department became involved, and that, based upon her limited contact with Vernon, she believed that he had the ability to complete the treatment plan. Without any further evidence or testimony, the District Court then entered its order stating: "Based upon the record herein and the testimony presented, the Court finds no reason to disturb its previous adjudication of the youths as Youths in Need of Care."

14

¶36 By then, the District Court had stated on three previous occasions that the children were youths in need of care: first, at the initial TIA hearing on October 27, 1999; second, at the TIA extension hearing on March 6, 2000; and third, in approving Tina's stipulation from the July 5, 2000, temporary legal custody hearing. At the initial TIA hearing, the District Court determined by a probable cause standard that the children were youths in need of care within the meaning of § 41-3-102, MCA. Following the TIA extension hearing, the District Court stated that its order was "[b]ased upon the evidence presented and the testimony given there having been established by overwhelming evidence that it is not possible to safely return the children to their home, and the Court previously having found by probable cause to believe that the above-named youths are Youths in Need of Care within the meaning of Section 41-3-102, MCA . . . ." A review of these hearings is helpful to the issue raised here.

¶37 At the initial TIA hearing, at which Tina and Vernon were present, the District Court received testimony that F.M. had been sexually molested by a person who also threatened to physically hurt or kill her if she told, and further, that Tina, even after knowing this and testifying to not trusting the alleged abuser, still allowed F.M. to be in a car alone with him. Testimony also demonstrated that F.M. repeatedly presented with head lice and was given very irregular, uneven hair cuts, down to the scalp in some places, and was at one time, shaved with a pair of scissors with patches of hair left in places. Further, the District Court

15

received testimony that Vernon had slapped F.M. in the ears, called her derogatory, profane negative names, and had threatened to burn the house down, starting with F.M.'s room. Tina testified that she obtained a temporary order of protection against Vernon for her own safety. Additionally, testimony by the Department and Tina demonstrated that F.M. was missing a significant amount of school, including approximately nine of the first seventeen days, was often late and was performing very poorly. Further, F.M. was exhibiting symptoms of post-traumatic stress disorder and problems with bowel control.

¶38 At the TIA extension hearing, again with Tina and Vernon present, the District Court received eleven Department exhibits and testimony from three Department witnesses as well as testimony from Tina and from Dr. Jeff Schroeder on her behalf. Subsequent to the hearing, the District Court entered its order finding that "overwhelming evidence" established that it was "not possible to safely return the children to their home" and that it was in the children's best interest to continue to be removed from the home with continued placement in the care and authority of the Department. The District Court reiterated that it had previously found by probable cause that the children were youths in need of care within the meaning of § 41-3-102, MCA.

¶39 Finally, at the July 5 temporary legal custody hearing, the District Court received Tina's stipulation that the children were youths in need of care, and subsequently approved it. Of significance, however, is that the District Court did not receive

16

evidence regarding Vernon at the July 5 hearing and, recognizing in its order that its adjudication in regard to Tina did not apply to Vernon, ordered Vernon served via publication. It was only after completed service by publication upon Vernon and the August 16 hearing that the District Court stated that it found "no reason to disturb its previous adjudication of the youths as Youths in Need of Care."

¶40 Prior to this ruling, the procedural history of the case clearly demonstrates that the District Court had twice prior to Tina's stipulation stated that the children were youths in need of care in regard to Vernon within the meaning of § 41-3-102, MCA; that it recognized that Tina's stipulation did not suffice as an adjudication of abuse and neglect in regard to Vernon, and following Vernon's absence from the July 5 hearing, had Vernon served with a notice of hearing by publication; that Vernon did not appear at the August 16 hearing, and, after taking additional evidence, the District Court referenced its earlier adjudications, which included a finding that there was "overwhelming evidence" that the children could not be returned home.

¶41 Section 41-3-102(23), MCA, defines "youth in need of care" as a youth who has been adjudicated or determined, after hearing, to be or to have been abused or neglected. The term "child abuse or neglect" includes "actual harm or substantial risk of harm by the acts or omission of a person responsible for the child's welfare." Section 41-3-102(7)(a), MCA. *In re A.M.*, ¶ 41. Harm to a child's health or welfare means, in part, "harm that occurs whenever the

17

parent or other person responsible for the child's welfare: (a) inflicts or allows to be inflicted upon the child physical or psychological abuse or neglect; [or] (b) commits or allows to be committed sexual abuse or exploitation of the child." Section 41-3-102(9), MCA.

¶42 While the District Court did not specifically state, pursuant to § 41-3-404(1), MCA, that it determined by a preponderance of the evidence that the children were youths in need of care, the evidence clearly demonstrates that F.M. had suffered actual harm and that the children were in danger of a substantial risk of harm to their health and welfare as defined in § 41-3-102(9), MCA. See *In re A.M.*, ¶ 41. Further, it is apparent from the District Court's order granting temporary legal custody as to Vernon on August 16, that it believed its previous adjudication that the children were youths in need of care was sufficiently based on "overwhelming evidence" of abuse and neglect.

¶43 We will not disturb a district court's findings on abuse and neglect "unless a mistake of law exists or the factual findings are not supported by substantial evidence." *In re B.H.M.* (1990), 245 Mont. 179, 184, 799 P.2d 1090, 1093-94 (citation omitted). Based upon the evidence received by the District Court in the instant case and its language in its order extending the Department's investigative authority, we cannot conclude that the District Court made a mistake of law or that its factual findings are not supported by substantial evidence. We hold, therefore, that the

18

District Court, based on substantial evidence, properly adjudicated the children as youths in need of care in regards to Vernon.

¶44 **Did the District Court err in determining that the criteria of § 41-3-609, MCA, were met by clear and convincing evidence when terminating the parental rights of Tina?**

¶45 Tina alleges that the District Court erred in finding by clear and convincing evidence that she did not comply with the court-approved treatment plan and that the treatment plan was not successful. Tina asserts that the record reflects that until the incident on December 20, 2000, when Vernon was discovered at Tina's residence, the professionals involved in the case believed that Tina was successfully progressing towards reunification with her children and was successfully completing the treatment plan.

¶46 The Department argues that, while the counselors and treating professionals were under the impression that Tina was successfully complying with the treatment plan, the discovery of Tina's ongoing deception throughout the proceedings undermined any success that the professionals initially thought Tina was making. The Department notes that, from early in the proceedings, Tina had told her counselors and treating professionals that she needed to end her destructive and abusive relationship with Vernon because he posed a danger to her. Yet, Tina secretly continued the harmful relationship, thereby deceiving treatment providers and failing to fully comply with several treatment requirements, including failing to learn to put the children's needs before her own. The Department thus argues that Tina's treatment successes were illusory because her treatment providers assumed that she was

19

coming to terms with her destructive relationship with Vernon when she instead continued to see him.

¶47 The Department finally argues that Tina's history and cognitive limitations, combined with the failed efforts of at least a dozen treatment professionals, supports the District Court's determination that Tina's destructive behavior was unlikely to change within a reasonable period of time.

¶48 Prior to terminating an individual's parental rights, a district court must adequately address each applicable statutory requirement to determine if it has been established, and the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every requirement set forth in the statute has been satisfied. *In re S.M.*, 2001 MT 11, ¶ 30, 304 Mont. 102, ¶ 30, 19 P.3d 213, ¶ 30. In the context of termination of parental rights cases, we have defined clear and convincing evidence as simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof. *In re S.M.,* ¶ 30 (citing ***In the Matter of B.F., R.F., and M.S., Jr.,* 2000 MT 231, ¶ 7, 301 Mont. 281, ¶ 7, 8 P.3d 790, ¶ 7***). This Court's standard of review for a district court's findings is whether they are clearly erroneous. *In the Matter of B.F.*, ¶ 7.

¶49 Section 41-3-609, MCA, sets forth the relevant statutory language for the termination of parental rights in this case:

20

(1) The court may order a **termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:**

...

(f) the **child is an adjudicated youth in need of care and both of the following exist:**

(i) an **appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and**

(ii) the **conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.**

¶50 **When considering the criteria for termination, primary consideration must be given to the best interests of the child as demonstrated by the child's physical, mental, and emotional conditions and needs.** *In re S.M.*, **¶ 31 (citing** *In the Matter of J.N. and A.N.,* **1999 MT 64, ¶ 13, 293 Mont. 524, ¶ 13, 977 P.2d 317, ¶ 13).**

¶51 The District Court found that Tina failed to demonstrate an ability to put her children's needs before her own during counseling with Dr. Carol Blum or to show that she understood relationships which placed her children at risk. The District Court also found that Tina failed to demonstrate the ability to meet the emotional needs of her children and to refrain from contact with Vernon, but rather, continued to have contact with Vernon throughout the case, going so far as to hide the contact and thus be convicted of obstructing a police officer.

¶52 Based upon the foregoing, the District Court found that Tina engaged in a pattern of dishonesty with her social worker and other professionals in the case, including Dr. Blum, all of which severely undermined the progress she appeared to be making and thus restricted the ability of the Department to safely reunite the

21

children with Tina in a timely fashion, despite the Department's best efforts.

¶53 Upon a review of the record, we conclude there is ample evidence to support the District Court's determination that Tina had not successfully complied with the treatment plan nor had it been successful and that she was unlikely to successfully complete it within a reasonable time. For example, the record indicates that Tina recognized early in her counseling that Vernon's verbal and physically abusive behavior created an unhealthy and unacceptable environment for the children, and that to be successful in her counseling required that she follow Dr. Baxter's suggestion of sustaining a lengthy period of no contact with Vernon. Tina, however, remained in contact with Vernon throughout much of the proceedings.

¶54 Dr. Blum, Tina's individual counselor and therapist, testified that Tina's pattern of dishonesty with her therapists and treatment professionals demonstrated her inability to place her children's needs above her own and an inability to safely parent the children. Dr. Blum further testified, consistent with Dr. Baxter's psychological evaluation, that Tina's limited cognitive ability, difficulty with learning material through verbal means and retaining it, difficulty with absorbing verbal information, and long-standing personality difficulties, make it very hard for her to change the kind of relationships and kind of lifestyle she leads, and to maintain that change. Dr. Blum testified that she did not think Tina could successfully complete a treatment plan in

Comment [COMMENT9]: Trans. p. 14

22

six to twelve months or make much better progress than she had done in the previous ten months with intensive treatment.

¶55 Cheryl Thurman, a family support specialist with Western Montana Comprehensive Developmental Center, testified that Tina did not successfully complete the treatment objectives aimed at improving her parenting of D.M. and helping him to develop his speech, communication, play and social skills. Tina admitted to not spending sufficient time working with D.M.

Comment [COMMENT10]: Trans. 79.

¶56 Harris, Tina's case manager, testified that Tina's association with Vernon signified a failure of Tina to demonstrate an understanding of relationships which placed her children at risk, and that Tina's deceitfulness undermined all parts of the treatment plan. Harris also testified, consistent with Thurman, that Tina did not follow through with her treatment objectives and did not show up for each of the scheduled visitations.

Comment [COMMENT11]: Trans. 126

¶57 Further complicating any possibility of Tina successfully completing a treatment plan within a reasonable time is that, according to Harris, most of Tina's treating professionals were unwilling to further work with her because of her dishonesty. Harris testified that if the District Court were to grant Tina more time to work on a treatment plan, a new treatment team would have to be assembled, including a new counselor, new case manager and new therapist for the children, thereby greatly increasing the time it would take for Tina to successfully complete a treatment plan.

Comment [COMMENT12]: Trans. 159

¶58 Although testimony supports that Tina was partly successful with some goals of her treatment plan and that her treating

23

professionals believe that she was making progress through December 2000, the evidence demonstrates that even with Tina's limited compliance, she did not successfully complete her treatment plan and would not be able to do so within a reasonable time. This Court has repeatedly held that partial compliance with a treatment plan is insufficient to preclude termination of parental rights. Not only must a parent comply with the treatment plan, but the treatment plan must also be successful. *In re S.M.*, ¶ 44 (citations omitted).

¶59 Based upon the foregoing testimony, we conclude that the District Court did not err when it determined that clear and convincing evidence supported the finding that Tina failed to complete her treatment plan, would not be able to complete the plan within a reasonable time, and that it was in the best interests of F.M. and D.M. that Tina's parental rights be terminated. The District Court's findings are, therefore, not clearly erroneous.

¶60 The decision of the District Court is affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ PATRICIA COTTER