No. 03-411

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 377N

IN RE THE MATTER OF B.B.W.,

　　　A Youth in Need of Care.

APPEAL FROM:　　District Court of the Sixth Judicial District,
　　　　　　　　In and for the County of Park, Cause No. DN-02-23,
　　　　　　　　The Honorable Randal I. Spaulding, Judge presiding.

COUNSEL OF RECORD:

　　　　　For Appellant:

　　　　　　　Kevin S. Brown, Paoli & Brown, P.C., Livingston, Montana

　　　　　For Respondent:

　　　　　　　Hon. Mike McGrath, Attorney General; Robert Stutz,
　　　　　　　Assistant Attorney General, Helena, Montana

　　　　　　　Tara DePuy, Park County Attorney, Livingston, Montana

　　　　　　　Kellie A. Voyich, Anderson & Voyich, Livingston, Montana (Guardian Ad
　　　　　　　Litem)

　　　　　　　　　　　　Submitted on Briefs:　December 4, 2003

　　　　　　　　　　　　　　　Decided:　December 30, 2003

Filed:

　　　　_____
　　　　　　　　　　　　Clerk

1

Justice John Warner delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. The decision shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 M.W. and K.W. are the natural parents of B.B.W. M.W. and K.W. appeal from an order of the Sixth Judicial District Court, Park County, denying their Motion to Dismiss. They seek reversal of the denial of their Motion to Dismiss, and an order dismissing the Park County Department of Health and Human Services' combined Petition for Emergency Protective Services, Determination that Preservation or Reunification Services Need Not be Provided, Termination of Parental Rights, and For Award of Custody and Right to Consent to Adoption.

¶3 We affirm the District Court.

¶4 The issues on appeal are as follows:

¶5 1. Did the District Court err in finding that the parents were interviewed by Department personnel prior to the Department's filing of a petition for emergency protective services, as required by § 41-3-101(1)(i), MCA (2001)?

¶6 2. Did the District Court properly determine that the statutory requirements of § 41-3-427(1)(c), MCA, were met regarding presentation of evidence to a court?

FACTS

¶7 K.W. and M.W. ("the parents" or "appellants") are the natural parents of B.B.W.

2

B.B.W. was delivered by Caesarean-section on November 11, 2002. At no time prior to the birth did anyone from the Park County Department of Health and Human Services (the Department) speak with K.W. or M.W. about the Department's intention to remove B.B.W. from them. Moments after his birth, B.B.W. was taken into custody by social workers for the Department. At the time of the removal, two social workers from the Department and a police officer took M.W. aside and told him they were removing the child. M.W. asked why and was told that he and K.W. had not made significant progress since the prior termination of their rights to another child in 2001, and the Department believed that they would not be able to provide a safe home for B.B.W. The social workers provided M.W. with a written notice of the Department's intentions toward the baby, which included an explanation of the Department's reasons for the removal. They asked M.W. if he had any questions, and M.W. indicated he did not. The social workers then explained to M.W. that if he had any questions he was free to call their office.

¶8      A Department social worker also spoke to K.W. while she was in the recovery room after the Caesarean-section, and still groggy from the anesthetic. The social worker entered K.W.'s room and first asked K.W. if she recognized her. K.W. indicated that she did. The social worker then explained that B.B.W. was being removed and the reasons for the removal. K.W. was very upset and asked why. The social worker told K.W. that she would be willing to come back and speak with her another time, or that K.W. could call the office. The social worker did not return and neither M.W. nor K.W. called the Department.

¶9      M.W. and K.W. were not present at the initial hearing on the petition on November 12, 2002. At that time, K.W. was still in the hospital. The couple did not see the petition

3

until they were served with it four days later, on November 16, 2002.

## STANDARD OF REVIEW

¶10   This Court reviews a decision to terminate parental rights to determine whether the district court's findings of fact supporting the termination are clearly erroneous, and whether its conclusions of law are correct. *In re F.M.,* 2002 MT 180, ¶ 21, 311 Mont. 35, ¶ 21, 53 P.3d 368, ¶ 21. If the district court's findings of fact are not supported by substantial evidence; if it misapprehended the effect of the evidence; or, if after reviewing the record this Court is left with a definite and firm conviction that the district court made a mistake, then the district court's findings will be held to be clearly erroneous. *In re F.M.,* 2002 MT 180, ¶ 21, 311 Mont. 35, ¶ 21, 53 P.3d 368, ¶ 21.

¶11   While keeping in mind a parent's fundamental liberty interest in the care and custody of his child, a court's primary consideration, when considering the criteria for termination of parental rights, is the best interests of the child. A parent's rights must be accorded fundamentally fair procedures at all stages of termination proceedings, but a child's physical, mental, and emotional needs are paramount in any determination. *In re F.M.,* 2002 MT 180, ¶ 22, 311 Mont. 35, ¶ 22, 53 P.3d 368, ¶ 22.

## DISCUSSION

### ISSUE ONE

¶12   Did the District Court err in finding that the parents were interviewed by Department personnel prior to the Department's filing of a petition for emergency protective services, as required by § 41-3-101(1)(i), MCA (2001)?

4

¶13    Section 41-3-101(1)(i), MCA (2001),[1] reads as follows:

> (1)  It is the policy of the state of Montana to:
>
> (i) require a department social worker to interview the parents of a child to which a petition pertains, if they are reasonably available, before the state may file a petition for temporary investigative authority or a petition for immediate protection and emergency protective services and to require that a judge may not issue an order granting a petition, except an order for immediate protection of the youth, until the parents, if they are reasonably available, are given the opportunity to appear before the judge or have their statements, if any, presented to the judge for consideration before an order is granted . . . .

This statute requires the Department to interview the parents before the Department files a petition for immediate protection of a youth. B.B.W. was born during the day on November 11, 2002. The petition was filed at 8:20 a.m. on November 12, 2002. Thus, the time frame spanning the hours between B.B.W.'s birth and the filing of the petition was not more than twenty-four hours. The appellants acknowledge that the Department spoke to both parents concerning the removal shortly after B.B.W.'s birth, and before the petition was filed. Appellants complain that the interviews conducted were meaningless because of their brevity and lack of substance, while the Department planned months in advance to take custody of B.B.W. immediately upon his birth. Appellants argue that their fundamental liberty interests in the care and custody of their child were infringed upon because the Department did not ensure that the procedures utilized to remove B.B.W. were fundamentally fair.

¶14    Montana law recognizes that parents facing termination of their parental rights must not be placed at an unfair disadvantage at any stage of a termination proceeding. *Matter of A.S.A.* (1993), 258 Mont. 194, 198, 852 P.2d 127, 129. This guarantee of fundamental

---

[1]  The Legislature deleted § 41-3-101(1)(i) in the 2003 session. As the circumstances of this case occurred before the repeal, the prior law is applicable.

fairness derives from Article II, § 17, of the Montana Constitution which guarantees that "[n]o person shall be deprived of life, liberty, or property without due process of law." We must remember, however, that in proceedings where a youth is in danger of being neglected or abused, § 41-3-101(4), MCA, mandates that the health and safety of an infant be given paramount consideration.

¶15 The District Court in this case had a bevy of evidence before it which tended to show that the Department was correct in its assessment that the best interests of the child would not have been served had the Department interviewed the parents prior to the birth. The parents had previously had a child removed from their custody because they did not have the necessary mental faculties to parent a child. Both were diagnosed with varying degrees of mental and emotional illnesses, and two separate clinical psychologists testified that neither of the parents were capable of parenting any child, and would not be able to do so in a reasonable amount of time. Both had completed parenting classes at the Department's behest, but were unable to put the knowledge learned into practice with a real child. At the time of the first child's removal, the child was suffering from malnutrition and water-on-the-brain.

¶16 In addition to these parenting issues, the District Court was also presented with evidence that both of the parents had exhibited bizarre and/or threatening behavior towards each other, Department personnel, members of the community, and the court system. K.W. wrote a letter describing the social workers' children as "scourge of the earth, unclean, unpure . . . " and referred to Columbine as a way to get rid of "those people's children". M.W. made inquiries with his former employer about whether anyone there knew of

6

someone who would perform "in-home" Caesarean-sections. M.W. went to the Republican Party headquarters and threatened to blow up the courthouse because they had taken away his guns and his daughter. K.W. told the clerk of court that she and M.W. would fight to the death for this child. K.W. would also periodically drive by the welfare office pointing out the window at employees sitting on the deck and cackling "like a witch."

¶17　We agree with the appellants that the timing and circumstances of the hospital interviews were not ideal, and that it may have been possible to give them more substantial interviews by telephone. The overwhelming weight of the evidence, however, illustrates to us that in this extraordinary situation the Department was justified in waiting until the child's birth to speak to the parents. In ruling on the Motion to Dismiss, the District Court noted that at the time of the removal the social workers gave the parents written notification of the reasons for the removal, informed them that the petition would be filed and would be followed by a hearing, and provided contact information for the social worker assigned to their case. Additionally, the social workers discussed the removal with both parents and gave them an opportunity to raise any questions. Neither of them chose to do so. These actions on the part of the Department, under these circumstances, satisfied the statutory requirement that an interview be conducted. The District Court was correct in denying the Motion to Dismiss.

## ISSUE TWO

¶18　Did the District Court properly determine that the statutory requirements of § 41-3-427(1)(c), MCA, were met regarding presentation of evidence to a court?

¶19　The Department filed the Petition for Emergency Protective Services, Determination

7

that Preservation or Reunification Services Need Not be Provided, Termination of Parental Rights, and For Award of Custody and Right to Consent to Adoption, early on November 12, 2002. At 1:22 p.m. on that same day, the District Court entered an order setting November 26, 2002, as the date for hearing on the Petition. The order also granted the Department temporary legal custody of B.B.W. until the hearing could be held.

¶20 Section 41-3-101(1)(i), MCA (2001), requires the Department interview the parents before a petition is filed. This section also provides that the parents be given opportunity to appear before the judge before the petition is granted. Section 41-3-427(1)(c), MCA, reiterates that the parents must be given opportunity to present evidence to the court before the court rules on the petition.

¶21 Appellants, in arguing that the requirements of the statute were not met because they did not appear before the court before the November 12 order was issued, fail to seize upon the provision in § 41-3-101(1)(i), MCA (2001), that states, "[A] judge may not issue an order granting a petition, *except an order for immediate protection of the youth*, until the parents . . . are given the opportunity to appear before the judge . . ." (emphasis added).

¶22 The order entered on November 12, 2002, granted the petition only to the extent allowed by § 41-3-101(1)(i), MCA (2001), for immediate protection of B.B.W. After the November 12, 2002, order was entered, and after several agreed continuances, the court held a hearing on the appellants' Motion to Dismiss on January 2, 2003, at which it heard evidence from both the Department and the appellants. On January 3, 2003, the District Court entered an order denying the Motion to Dismiss. On March 17, 2003, the court held a hearing on the merits of the petition at which the appellants again presented evidence in

8

support of their position. On April 17, 2003, the court entered its Findings of Fact, Conclusions of Law, and Order which terminated appellants' parental rights to B.B.W. Thus, the court did not grant the petition until the appellants had, on two separate occasions, opportunities to present evidence to the judge.

¶23 On these facts, we hold that the appellants were not denied the procedural rights to present evidence afforded to them by §§ 41-3-101(1)(i), MCA (2001), and 41-3-427(1)(c), MCA.

¶24 Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON