No. 05-387

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 4

IN THE MATTER OF P.S.,

    A Youth in Need of Care.

APPEAL FROM:    The District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DN 2003-01,
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Kirsten Mull Core, Attorney at Law, Bozeman, Montana (For Mother)

            R. Stan Peeler, Peeler Law Office, Bozeman, Montana (For Father)

        For Respondent:

            Honorable Mike McGrath, Attorney General; Tammy K. Plubell and
Peter Bovingdon, Assistant Attorneys General, Helena, Montana

            Marty Lambert, County Attorney, Bozeman, Montana

            Ralph W. Steele, Tarlow & Stonecipher, Bozeman, Montana (For Guardian
Ad Litem)

            Karen Tkach, Bozeman, Montana (Guardian Ad Litem)

Submitted on Briefs:  November 9, 2005
Decided:  January 10, 2006

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 In two separate hearings, the Eighteenth Judicial District Court, Gallatin County, terminated the parental rights of L.W. and M.S. with regard to their daughter, P.S. On different grounds, both parents appeal. We restate the issues as follows:

¶2 1. Did the District Court err by involuntarily terminating M.S.'s parental rights, rather than allowing M.S. to voluntarily relinquish his parental rights during the termination hearing?

¶3 2. Did the District Court properly exercise its discretion when it terminated LW.'s parental rights to P.S.?

## BACKGROUND

¶4 L.W. gave birth to a baby girl, P.S., on October 7, 2002. At twenty-two days old, P.S.'s father, M.S., was arrested for a domestic altercation with L.W.; another physical altercation between M.S. and L.W. occurred approximately one month later. These acts of violence took place in the presence of P.S. When a social worker met with L.W. to discuss concerns regarding P.S., L.W. admitted to using marijuana, but claimed it did not affect her ability to parent. In light of the domestic violence disputes, drug use, as well as L.W.'s extensive history with mental problems, including time spent in and out of residential treatment, the Department of Public Health and Human Services (DPHHS) filed a petition for temporary legal custody of P.S.

¶5 On January 7, 2003, the District Court filed an order for immediate protection of P.S. and appointed counsel for all parties, and guardian ad litem, Karen Tkach (Tkach), to

2

represent P.S. Based on an affidavit filed by social worker Gayle Frandsen, the court determined that probable cause existed "to believe that P.[S]. is abused or neglected or in danger of being abused or neglected and that immediate protection of the child is required." L.W. and M.S. were ordered to appear for a show cause hearing, at which time the court explained the procedures to be followed, including their right to admit or deny the allegations contained in the petition and to provide testimony. After considering all of the evidence, including L.W.'s and M.S.'s stipulations that probable cause existed, the court determined that P.S. required "further immediate protection" and ordered that in the best interest of the child, she "should remain in temporary out-of-home care." On February 3, 2003, the court entered an order adjudicating P.S. a "youth in need of care" and ordered DPHHS to develop treatment plans for L.W. and M.S. At the subsequent dispositional hearing, the court approved separate treatment plans for L.W. and M.S., awarded temporary legal custody to DPHHS for six months, ordered that L.W. and M.S. each be permitted to visit P.S. through Hearts and Homes at least two times per week (contingent upon clean, random urine tests) and scheduled a review hearing date.

¶6 Over much of the next two years, P.S. remained in the custody of DPHHS, while the Department worked with L.W. and M.S. in hopes of reuniting the parents with their daughter. Despite DPHHS's efforts to reunify, community social worker Nikki Neville (Neville) filed an affidavit on October 1, 2004, for termination of M.S.'s parental rights as P.S.'s father. Neville concluded that while M.S. had successfully completed some of his treatment plan goals—including attaining his GED and taking parenting classes through Hearts and

3

Homes—overall, he had trouble maintaining the expected level of compliance. M.S. failed to consistently provide a safe and stable home for himself and P.S. (in part due to losing his job) and frequently tested positive for drug use. Psychological evaluations indicated that M.S. had deficient coping skills, including acting in an angry, rebellious and poorly controlled manner when unable to avoid emotional situations—all consistent with his history of criminal behavior. Since losing custody of his daughter, M.S. was a suspect in two burglaries and was charged with disorderly conduct as the result of an altercation with L.W. A psychiatric evaluation reported as problematic M.S.'s significant depressive symptoms and lack of interest in exploring feelings or psychological issues. While M.S. initially completed the Intensive Outpatient treatment through Alcohol and Drug Services of Gallatin County, he failed to follow through with the aftercare portion of the program. M.S. further failed to comply with his treatment plan when he used drugs and did not attend Alcoholics Anonymous/Narcotics Anonymous and Anger Management classes. Because of M.S.'s inconsistent job history, Neville expressed doubt over his ability to provide. Moreover, by the end of 2003, due to drug use and failure to schedule visitations, M.S. had gone approximately six months without seeing his daughter. In light of M.S.'s irregular visits with his daughter, Neville had serious concerns with M.S.'s failure to understand the importance of a strong bond and consistent contact with his child.

¶7 At the same time DPHHS filed a petition to terminate M.S.'s parental rights, it also sought to place P.S. with her mother, L.W. Guardian ad litem Tkach did not agree with DPHHS and recommended termination of L.W.'s parental rights, as well. The court

conducted a review hearing and ultimately decided to extend DPHHS's temporary legal custody of P.S. Shortly thereafter, DPHHS changed its stance and Neville filed an affidavit for termination of L.W.'s parental rights. Neville explained that while L.W. completed the minimum requirements of her treatment plan—including providing suitable housing, completing a psychological evaluation and following recommendations, completing a chemical dependency evaluation, allowing departmental access to her home and maintaining acceptable contact with Neville, participating in mental health counseling and psychiatric treatment, completing parenting classes, and cooperating with her AWARE case manager and therapeutic aide—there were many difficulties along the way. L.W. was in an automobile accident and suffered a broken neck the day after the court initially granted DPHHS custody of P.S. Consequently, L.W. required ongoing medical treatment to deal with her physical pain. Neville concluded that L.W. displayed a lack of judgment regarding her medication—apparently consuming more than the recommended dosage—and often appeared "out of it" or "loopy" during phone calls or house visits by providers; at times she slurred her words to the point of being incomprehensible. In violation of her treatment plan, L.W. admitted to drinking wine and failed to understand the problem with such conduct; she also spent much of her time with people engaged in illegal drug use, although evidence revealed no use of illegal substances on L.W.'s part. In addition, L.W. was convicted of stealing a purse belonging to a foster child during one of her visits to Hearts and Homes.

¶8    In March of 2005, during two separate termination hearings, the District Court heard a variety of testimony from public officials involved in P.S.'s well-being. During the hearing

5

addressing M.S.'s rights as father, M.S. requested a sidebar after the State called its fifth witness, at which time he explained his willingness to "voluntarily relinquish parental rights," but objected "to relinquishing parental rights in an *in*voluntary fashion . . . ." (Emphasis added.) In response, the court stated that unless M.S. agreed that the State would not be required to provide a treatment plan to M.S. prior to initiating termination proceedings regarding any future children M.S. may have (in accordance with § 41-3-423(2)(e), MCA), the court would deny voluntary relinquishment and instead terminate M.S.'s parental rights involuntarily. After a short recess and another sidebar, M.S. restated his request to voluntarily relinquish his parental rights before the State fully presented its case, while the State countered that it should finish presenting evidence sufficient to terminate. The court ultimately allowed the termination hearing to continue, and concluded that it was in the best interest of P.S.—a youth in need of care—to terminate M.S.'s parental rights and award custody to DPHHS. The court further stated "that [it] does this with the understanding that [M.S.] questions the authority of the Court to proceed with the termination after the father has, number one, relinquished his parental rights and, number two, waived his right to counseling prior to relinquishing his rights."

¶9     During the second hearing, in which the court addressed L.W.'s parental rights, several witnesses involved with her treatment plan testified, including DPHHS officials, law enforcement and physicians—all of whom believed L.W. had made minimal progress since the State took on her case two years earlier. Neville, who initially favored granting L.W. custody, asserted that L.W.'s tendency to engage in unhealthy, unsafe and deceptive

6

behaviors, warranted termination of her parental rights. Based on testimony from fifteen witnesses, the court concluded that L.W. "had not come far enough to safely and adequately parent her child"; therefore, in the best interests of P.S., it ordered her parental rights terminated and awarded permanent legal custody to DPHHS.

## STANDARD OF REVIEW

¶10    "In reviewing a decision to terminate parental rights, this Court determines whether the district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct. A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or, if after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. This Court will not disturb a district court's findings on abuse and neglect unless a mistake of law exists or the factual findings are not supported by substantial evidence." *In the Matter of F.M. and D.M.*, 2002 MT 180, ¶ 21, 311 Mont. 35, ¶ 21, 53 P.3d 368, ¶ 21 (citations omitted).

## DISCUSSION

### Issue 1

*Did the District Court err by involuntarily terminating M.S.'s parental rights, rather than allowing M.S. to voluntarily relinquish his parental rights during the termination hearing?*

¶11    Section 41-3-609, MCA, instructs the following with regard to termination of parental rights:

> **41-3-609. Criteria for termination.**   (1) The court may order a termination of the parent-child legal relationship upon a finding established by

7

clear and convincing evidence . . . *that any of the following circumstances exist*:

    (a) *the parents have relinquished the child pursuant to 42-2-402* and 42-2-412;

    (b) the child has been abandoned by the parents;

    (c) the parent is convicted of a felony in which sexual intercourse occurred or is a minor adjudicated a delinquent youth because of an act that, if committed by an adult, would be a felony in which sexual intercourse occurred and, as a result of the sexual intercourse, the child is born;

    (d) the parent has subjected a child to any of the circumstances listed in 41-3-423(2)(a) through (2)(e);

    (e) the putative father meets any of the criteria listed in 41-3-423(3)(a) through (3)(c); or

    (f) the child is an adjudicated youth in need of care and both of the following exist:

    (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

    (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

(Emphasis added.) Importantly, if the court involuntarily terminates a parent's rights under § 41-3-609, MCA, DPHHS may forego "reasonable efforts to provide preservation or reunification services" to that parent with regard to any future children placed with DPHHS. Section 41-3-423(2)(e), MCA.

¶12    Section 42-2-402(1), MCA, states that voluntary relinquishment of a child is valid if "the parent specifically relinquishes custody of the child to [DPHHS], a licensed child-placing agency, or a specifically identified prospective adoptive parent . . . ." During the termination hearing, the District Court made it clear that it would proceed with involuntary termination unless M.S. stipulated that, should he have children in the future, the State would not be required to provide him with a treatment plan prior to seeking termination of parental rights. M.S. argues that no rational basis, nor statute, exists for requiring such a stipulation

8

and that the only reason "to obtain an involuntary termination was to affect future children that M.S. may have . . . [because] the State does not want to be obligated to provide a treatment plan prior to seeking termination of parental rights." Additionally, M.S. argues, the fact that he verbally relinquished his parental rights under oath before the District Court determined to involuntarily terminate his parental rights effectively preempted the court's determination and removed the issue from the court.

¶13 The State does not deny M.S.'s contention that it desires to simplify termination of M.S.'s parental rights to future children, should he have any. Instead, the State argues in response that no legal authority requires the District Court to allow a parent to voluntarily relinquish his parental rights midway through a termination hearing in order to avoid the court involuntarily terminating parental rights pursuant to § 41-3-609, MCA. The State contends that in accordance with due process, DPHHS properly filed a petition to terminate M.S.'s parental rights as mandated by § 41-3-604(1), MCA, and at the termination hearing the District Court had the option to terminate M.S.'s parental rights pursuant to § 41-3-609(1)(f)—due to abuse and/or neglect, rather than relinquishment. "If M.S. wished to voluntarily relinquish custody of P.S.," the State asserts, "then he should have done so before P.S. had spent two years in foster care waiting for him to become rehabilitated, and DPHHS provided him with numerous resources to enable him to become rehabilitated." According to the State, the only reason M.S. decided at the last minute to voluntarily relinquish his parental rights during the termination hearing was because he "realized he had no defense to present against the termination petition . . . ."

9

¶14     Neither party cites case authority for their arguments. However, § 41-3-609(1)(a), MCA, states that voluntary relinquishment is only one of several criteria a District Court may take into account when ordering the termination of the parent-child legal relationship. Specifically, subsection (1) states that "[t]he court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence. . . that any of the following circumstances exist: (a) the parents have relinquished the child pursuant to 42-2-402 and 42-2-412 . . . ."[1] The statute then lists the other circumstances that permit court termination of parental rights in (b) through (f). In other words, even assuming a voluntary relinquishment of parental rights is valid under § 42-2-402, MCA, it is only one of several different criteria by which a "court may order a termination of the parent-child legal relationship . . . ." Section 41-3-609, MCA. Thus, despite M.S.'s contention that his voluntary relinquishment of parental rights to P.S. sufficiently terminated his rights, thereby precluding the court from continuing the hearing and ordering involuntary relinquishment, § 41-3-609(1)(a), MCA, clearly states otherwise—that is, although the court "may" take into account voluntary relinquishment when determining whether to involuntarily terminate a parent's rights, it is not required to do so. Voluntary relinquishment is only one of six bases for termination that are stated in the disjunctive We conclude that the District Court complied with statutory law by ordering the involuntary termination of M.S.'s parental rights.

---

[1]Section 42-2-402(1)(a), MCA, in turn, requires that before a voluntary relinquishment is valid, the department to which the child is being relinquished must agree in writing to accept custody until the child is adopted. Here, the record indicates that the Department had not, and would not, agree in writing to accept custody pursuant to a voluntary relinquishment.

**Issue 2**

*Did the District Court properly exercise its discretion when it terminated L.W.'s parental rights to P.S.?*

¶15 L.W. asserts a two-part argument that the District Court abused its discretion in terminating her parental rights. First, L.W. "contends that although she stipulated that [P.S.] met the legal definition of 'youth in need of care'. . . the Court could not later use her stipulation [at the termination hearing], without presenting the factual basis as a prerequisite to terminating her parental rights to P.S." We disagree. By definition, to "stipulate" is to "[a]rrange or settle definitely, as an agreement or covenant." BLACK'S LAW DICTIONARY, 1415 (6th ed. 1990). Thus, when L.W. stipulated to P.S. as a youth in need of care pursuant to § 41-3-434, MCA, she definitively agreed that her daughter was "abused, neglected, or abandoned." Section 41-3-102(29), MCA. The court had no obligation to further establish the factual basis for adjudicating P.S. as a youth in need of care. Moreover, the record does not indicate that L.W. raised this issue during the lower court proceedings. This Court will not review an issue raised for the first time on appeal. *In re Custody of N.G.H.*, 1998 MT 212, ¶ 19, 290 Mont. 426, ¶ 19, 963 P.2d 1275, ¶ 19. We conclude that the District Court properly ordered termination of L.W.'s parental rights, in part, based on P.S.'s status as an adjudicated youth in need of care.

¶16 The second part of L.W.'s argument is that the District Court based its decision on mistakes of fact and insufficient evidence, thus abusing its discretion. In its findings of fact, conclusions of law and order terminating L.W.'s parental rights, the District Court cited the

11

testimony of numerous witnesses involved in the termination hearing. The court's findings concluded with the following summation:

> [L.W.] may have minimally completed her treatment plan, but the plan was not successful. The professionals who worked with [L.W.] should be commended for their extraordinary effort. This Court believes that she made progress due in large part to their work, but it is clear she has not come far enough to safely and adequately parent her child.
>
> . . . .
>
> In making these findings, the Court considered the emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time, and the excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child. In doing so, the Court gave primary consideration to the physical, mental, and emotional conditions and needs of the child.

¶17 L.W. contends that the court's order includes "several mistakes of fact, attributing statements to witnesses that were not made by the witness . . . [and that] the findings made are clearly erroneous as they are not supported by substantial evidence." Specifically, L.W. points out that the District Court's termination order inaccurately attributed testimony by one witness to another witness. The court also misstated that L.W. was convicted of stealing a "phone," when in fact, the item was a purse. L.W.'s greatest contention, however, is that the court order neglected to reference the positive testimony from hearing witnesses and instead focused only on the negative testimony. While the termination order does in fact include misstatements, these misstatements are immaterial to the court's conclusion. And while it is true that several witnesses provided positive testimony regarding L.W.'s progress, most of these witnesses also expressed grave concerns, as well.

12

¶18 As previously noted, "[t]his Court will not disturb a district court's findings of abuse and neglect unless a mistake of law exists or the factual findings are not supported by substantial evidence." *In the Matter of F.M. and D.M.*, ¶ 21 (citations omitted). We conclude that the District Court did not abuse its discretion in this case. Reviewing the record as a whole, the court, with the exception of minor immaterial misstatements, based its decision to terminate L.W.'s parental rights on factual findings supported by substantial testimonial evidence from a variety of professionals.

## CONCLUSION

¶19 We affirm the District Court's termination of M.S.'s and L.W.'s parental rights to their daughter, P.S.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ JAMES C. NELSON