DA 09-0178

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 332

IN THE MATTER OF:
J.M.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDJ 08-063-Y
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Jim Wheelis, Chief Appellate Defender; Tammy A. Hinderman, Assistant
Appellate Defender, Helena, Montana

    For Appellee:

        Hon. Steve Bullock, Montana Attorney General; Mark W. Mattioli, Assistant
Attorney General, Helena, Montana

        John Parker, Cascade County Attorney; Sarah Corbally, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs: August 5, 2009

Decided: October 13, 2009

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 D.M. appeals from an order of the Eighth Judicial District Court, Cascade County, terminating her parental rights. We affirm.

¶2 We review the following issue on appeal:

¶3 *Did the District Court abuse its discretion by terminating D.M.'s parental rights, based in part on its reliance on D.M.'s stipulation, where J.M. had not been determined to be an Indian child for purposes of ICWA until after the adjudication of J.M. as a youth in need of care?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 D.M. has a decade long history with the Department of Health and Human Services (Department), including multiple instances of drug abuse and involvement with law enforcement. The courts have terminated D.M.'s parental rights to five other children after she failed to follow previous treatment plans with respect to two children and voluntarily relinquished her rights to three others following the initiation of termination proceedings by the State.

### 1. The Adjudication of J.M. as a "Youth in Need of Care"

¶5 The Department removed J.M. from D.M.'s care at birth under emergency circumstances and placed her at Benefis Hospital in Great Falls due to medical conditions. The Department attempted to contact the Blackfeet Social Services to seek culturally-appropriate placement options for J.M. on her release based on the Department's belief that

2

J.M. might be an Indian child for purposes of the Indian Child Welfare Act (ICWA).

¶6 The Department petitioned for adjudication of J.M. as a youth in need of care and temporary legal custody on February 7, 2008, in response to alleged neglect and ongoing drug abuse by D.M. The Department also cited the failure of prior efforts to provide remedial services and rehabilitation programs to D.M. The Department notified the Blackfeet Tribe of the proceeding and the possibility that J.M. might be an Indian child. The Department based its belief that J.M. might be a member of the Blackfeet Tribe on D.M.'s identification of three possible putative fathers, including V.D., to whom D.M. was married at the time of J.M.'s conception. D.M. and V.D. divorced before the Department initiated these proceedings. Montana law presumes J.M. to be the natural child of V.D., however, because she was born within 300 days of the termination of D.M.'s marriage to V.D. Section 40-6-105(a), MCA. D.M.'s marriage to V.D. does not determine definitively J.M.'s status for purposes of ICWA. We nevertheless note D.M.'s marital status as it prompted the Department to notify the Blackfeet Tribe of J.M. as a possible Indian child. The Department had not completed DNA testing of V.D. or the other surviving putative father at the time of the petition.

¶7 The Department appeared at the adjudicatory hearing on May 13, 2008, with a social worker and an ICWA expert who were prepared to testify on the need for temporary legal custody of J.M. D.M. instead stipulated through counsel to the adjudication of J.M. as a youth in need of care and temporary legal custody. D.M. stipulated to granting temporary

3

legal custody of J.M. to the Department for a period of up to six months to allow D.M. to complete her court approved treatment plan. Counsel for D.M. also recognized the potential application of ICWA and waived testimony of the Department's ICWA expert.

¶8 The court adjudicated J.M. as a youth in need of care on May 15, 2008, and granted the Department temporary legal custody. The court observed that the Blackfeet Tribe had not indicated whether J.M. was an Indian child for purposes of ICWA and noted D.M.'s stipulation pursuant to § 41-3-434(1)-(2), MCA. The court concluded that "based on these facts and the stipulation of the Mother, a legal basis exists for continued court and [D]epartment intervention." The court cited D.M.'s continuing substance abuse, the prior terminations of her parental rights, and her stipulations in the instant case as clear and convincing evidence in support of its adjudication and temporary custody order.

## 2. The Termination of D.M.'s Parental Rights

¶9 The Department petitioned for termination of D.M.'s parental rights in November 2008, based on D.M.'s lack of progress with her court ordered treatment plan. The Department submitted a Permanency Plan Report in January 2009, reflecting the fact that J.M.'s paternity had been established, and that J.M. was an Indian child for purposes of ICWA. The Department stated that a Blackfeet Tribal Services representative would be invited to the Foster Care Review Committee meeting scheduled for February 19, 2009.

¶10 The termination hearing commenced on December 16, 2008, and concluded February 10, 2009. The Department presented evidence that D.M. had failed to complete treatment

4

and the fact of D.M. having been convicted of a DUI in July of 2008. An ICWA expert from the Blackfeet Tribe testified that J.M. would be in danger of serious emotional or physical harm if she were returned to D.M.'s care.

¶11 The Blackfeet Tribe filed a notice of intention to intervene to monitor the proceeding on February 16, 2009. The court issued an order granting the Blackfeet Tribe's motion to intervene on February 24, 2009. The court filed its order terminating D.M.'s parental rights on the following day.

## STANDARD OF REVIEW

¶12 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re F.M.,* 2002 MT 180, ¶ 21, 311 Mont. 35, 53, P.3d 368. A trial court abuses its discretion when it "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re the Matter of A.G.,* 2005 MT 81, ¶ 12, 326 Mont. 403, 109 P.3d 756. Where ICWA applies, we will uphold a district court's termination of parental rights if a reasonable fact finder could conclude beyond a reasonable doubt that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. *In the Matter of T.W.F.,* 2009 MT 207, ¶ 18, 351 Mont. 233, 210 P.3d 174.

## DISCUSSION

¶13 *Did the District Court abuse its discretion by terminating D.M.'s parental rights, based in part on its reliance on D.M.'s stipulation, where J.M. had not been determined to*

5

*be an Indian child for purposes of ICWA until after the adjudication of J.M. as a youth in need of care?*

¶14 D.M. argues that the District Court violated 25 U.S.C. § 1913 when it accepted D.M.'s stipulation of J.M. as a youth in need of care without first explaining the consequences and then obtaining her written consent. Section 1913 provides that a parent's consent to the foster care placement of a child or termination of parental rights is invalid unless executed in writing and with procedural safeguards designed to ensure that the parent understands the consequences of her consent. 25 U.S.C. § 1913(a). D.M. argues that the District Court's failure to follow the requirements of § 1913(a) invalidated the court's adjudication of D.M. as a youth in need of care.

¶15 Whether § 1913(a) applies to D.M. turns on the issue of whether the proceedings were "voluntary." D.M. argues that § 1913's failure to distinguish between "voluntary" and "involuntary" proceedings supports her claim that § 1913(a) applies to all voluntary "acts of foster care placement or termination of parental rights . . . regardless of the type of underlying procedure at issue." Thus, D.M. argues that her consent to adjudication and temporary placement triggered § 1913 notwithstanding the adversarial nature of the Department's petition.

¶16 D.M. argues against our adoption of the reasoning in a recent decision of the Washington Court of Appeals that held that § 1913(a) did not apply to an involuntary custody proceeding. *In re Welfare of M.G.*, 201 P.3d 354 (Wash. App. 2009). The mother

6

claimed that § 1913(a) applied to a dependency order to which she had agreed during the course of an involuntary custody proceeding. The state had initiated the proceeding due to the mother's drug addiction and inability to care for her child. *M.G.*, 201 P.3d at 358. The court declined to apply § 1913 in situations where the state had sought an involuntary placement of the child and the parent had been represented by counsel. *M.G.*, 201 P.3d at 358.

¶17    D.M. correctly observes that § 1913 does not distinguish on its face between voluntary and involuntary proceedings. Section 1913 by its terms, however, implicates voluntarily initiated termination or foster care proceedings. It is intended "to encourage parents to make appropriate placement of their children when they are not confident of their own ability to parent" and are without counsel. *M.G.*, 201 P.3d at 358. The lack of counsel highlights the informal nature of the proceedings covered by § 1913. D.M. did not approach the Department voluntarily to give up custody as contemplated by § 1913. D.M. appeared at the hearing with her appointed counsel in light of the adversarial nature of the proceedings.

¶18    Moreover, the Bureau of Indian Affairs titled its guidelines to § 1913 "Voluntary Proceedings" and clearly distinguished the § 1913 consent provisions from the procedure and rules applicable to "Involuntary Proceedings" to which § 1912 applies. *See* 44 Fed. Reg. 67, 593 (1979) (BIA Guideline E). If § 1913(a) were applied here, the court's temporary placement of J.M. with the Department would be deemed voluntary and revocable by D.M. This scenario makes no sense in light of D.M.'s extensive history of drug abuse, and her

7

failure to complete the most recent in a series of court approved treatment plans. These circumstances prompted the Department to initiate the adjudication. Allowing D.M. to characterize her stipulation as a voluntary act triggering § 1913 would ignore this history.

¶19 We faced an analogous situation in *In re P.S.*, 2006 MT 4, 330 Mont. 239, 127 P.3d 451. The Department had initiated termination proceedings. The father, in an effort to forestall the involuntary termination and its attendant consequences for future children, sought to relinquish voluntarily his parental rights. *P.S.*, ¶ 8. An involuntary termination leads to a presumption in favor of termination of parental rights to future children. *P.S.*, ¶ 8; § 41-3-423(2)(e), MCA. This Court rejected the father's efforts on the grounds that the termination statute, § 41-3-609(1)(a), MCA, provides a court with discretion whether to take into account a parent's attempt to relinquish voluntarily when deciding whether to order involuntary termination. *P.S.*, ¶ 14. D.M. here, too, may not tip the statutory balance in her favor by seeking to relinquish voluntarily her parental rights when faced with the prospect of involuntary termination. Section 1913(a) has no application to the involuntary termination proceedings initiated by the Department against D.M.

¶20 We turn now to the primary issue of whether the District Court abused its discretion by relying, in part, on D.M.'s stipulation in the adjudication of J.M. as a youth in need of care and its subsequent termination of D.M.'s parental rights. Any involuntary proceeding triggers ICWA's procedural safeguards "where the court knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912(a). The court must verify the child's status

with the Bureau of Indian Affairs or the child's tribe when it "has reason to believe that a child involved in a child custody proceeding is an Indian." Guidelines for State Courts; Indian Child Custody Proceedings B.1. (a) 44 Fed. Reg. 67, 586 (1979). In accordance with these guidelines, ICWA applies when a court has reason to know that a child may be an Indian child. *In re T.J.H.,* 2003 MT 352, ¶ 10, 318 Mont. 528, 81 P.3d 504. We have held previously that "tribes have ultimate authority to decide who qualifies as an 'Indian child.'" *A.G.,* ¶ 14.

¶21 Where, as here, the Department had reason to believe that it might be dealing with an Indian child, and in fact notified the tribe to that effect, we have held that a district court abused its discretion when it failed to resolve definitively the threshold question of whether the children at issue were "Indian children" within the meaning of ICWA. *A.G.,* ¶ 15. We determined that the district court should have delayed final adjudication pending a determination of the children's status once it had initiated proceedings to discover the Indian status of the children. *A.G.,* ¶ 16. The court instead unilaterally determined that the children were not "Indian children" despite responses from the Tribes indicating that further research was needed. *A.G.,* ¶ 5. The court also heard evidence from the mother and the children's grandmother concerning the children's eligibility for tribal enrollment, including a letter from the tribe indicating that it would intervene on the mother's behalf. *A.G.,* ¶ 7.

¶22 These facts distinguish this case from *A.G.* First, D.M. stipulated to the youth in need of care adjudication and to the treatment plan. A parent's valid stipulation under § 41-3-434,

9

MCA, can satisfy the required findings for the adjudication of a youth in need of care even absent an evidentiary hearing. *In re M.W.,* 2001 MT 78, 305 Mont. 80, 23 P.3d 206; *In re M.B.,* 2004 MT 304, 323 Mont. 468, 100 P.3d 1006. The District Court adjudicated J.M. as a youth in need of care based on both D.M.'s stipulation and the record as a whole.

¶23 Second, the Department notified the Blackfeet Tribe in this case of the proceedings at an early stage. The Court in *A.G.*, by contrast, terminated the mother's parental rights before the Tribe had made a final determination of the child's status. The record indicates that the Department attempted to work with Blackfeet Social Services to find a culturally-appropriate placement for J.M. in anticipation of her release from the hospital. These actions reflect the Department's belief that J.M. qualified as an Indian child for purposes of ICWA. The District Court's order adjudicating J.M. as a youth in need of care reflects that D.M. stipulated that ICWA applied and that D.M. "waived the testimony of the ICWA expert who was in court." The record further reflects that the Department had invited a tribal representative to the permanency plan hearing. A qualified ICWA expert testified at the termination hearing that "continued custody of the Youth by the Mother would likely result in serious emotional or physical damage to the child." Finally, the Blackfeet Tribe gave notice of its intention to exercise its right of intervention under 25 U.S.C. § 1911(c) to "monitor the custody proceeding." The Blackfeet Tribe tellingly has not interceded on D.M.'s behalf or objected to the termination of her parental rights.

¶24 The District Court complied with ICWA in finding by clear and convincing evidence

that J.M. was a youth in need of care. The court found beyond a reasonable doubt--also as required by ICWA--that J.M.'s physical, mental, and emotional best interests would be served by termination of the parent-child legal relationship. The fact that the court accepted D.M.'s stipulation to the adjudication of J.M. as a youth in need of care before it had definitively established J.M.'s Indian status does not invalidate the proceedings. The District Court did not abuse its discretion when it terminated D.M.'s parental rights.

¶25 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER

Justice James C. Nelson concurs.

¶26 I concur in the result of the Court's Opinion and for much of what is said therein. I do not agree, however, with the discussion that at the time the Blackfeet Tribe was first notified, the paternity of J.M. was yet to be decided. V.D. was one of J.M.'s putative fathers. As D.M. points out, however, she was married to V.D. at the time of J.M.'s conception. The District Court even referred to V.D. as the birth father. As noted in the Opinion, § 40-6-105(1)(a), MCA, provides that a person is presumed to be the natural father of a child if the person and the child's natural mother are or have been married to each other and the child is

11

born during the marriage or within 300 days after the marriage is terminated. *See In re Marriage of K.E.V.*, 267 Mont. 323, 329, 883 P.2d 1246, 1250 (1994). Applying this statute, as the trial court was required to do, V.D. should have been presumed to be the natural father of J.M. And, since V.D. was an Indian, J.M. was, likewise, an Indian child for ICWA purposes at the time the Department of Health and Human Services became involved in this case.

¶27 Additionally, and without going into the detail that appellate counsel did, I agree that the law was not entirely followed in this case. I have joined the Court's Opinion, but perhaps, for the wrong reason. Quite simply, given D.M.'s dismal track record and the unlikelihood that she will ever be able to parent J.M., I simply cannot find a good reason to send this case back to the District Court for further proceedings. I do not believe that would be in J.M.'s best interest when the likely outcome would be exactly the same. Moreover, given J.M.'s Indian status, her tribe had substantial input and involvement throughout this case. Therefore, the spirit, if not the letter, of ICWA was followed. Though my decision is, admittedly, result-oriented, that is not to say that I disagree with appellate counsel's arguments on appeal.

¶28 Finally, with regard to appellate counsel, in my view, she wrote excellent, thoroughly researched briefs on appeal, and she zealously and professionally represented her client. For that, unfortunately, she was sharply criticized by the State in its appellate brief. Over several pages, the State took her to task for her

very unfair decision to renege on the stipulation and waiver of OSPD counsel

12

[Office of State Public Defender] below . . . .

. . .

> Furthermore, it is patently unfair for the OSPD (Appellate Defender) to attack as plain error a stipulation an OSPD lawyer made below. It is unfair to Judge Neill and it [is] also unfair to J.M. and her foster parents. . . . The Appellate Defender's decision to renege on its stipulation also does not promote Indian cultural or tribal interests. . . .
>
> [Trial counsel's] stipulation, which was made before Indian child status was ascertained, should be honored by the Appellate Defender. At the very least, the district court . . . cannot be accused of plain error . . . .

State's counsel also accused the OSPD of pursuing a trial strategy of not making objections so that the error can then be raised under a plain error argument on appeal—thus causing delay in child abuse cases, discouraging the OSPD from training its lawyers to raise timely objections, and being unfair to the trial judge. I could not disagree more with the State's comments.

¶29 In the first place, appellate counsel has no moral, legal or ethical obligation to roll over and play dead for the convenience of the District Court or the State when she finds in the record legitimate appellate issues—regardless that her client's OSPD trial attorney might have been part of the problem. Indeed, Montana Rule of Professional Conduct (M.R.P.C.) 1.1 demands that an attorney provide competent representation to a client—that is, representation which encompasses legal knowledge, skill, thoroughness and preparation. Appellate counsel provided her client with competent representation on appeal in this case within that definition. Moreover, appellate counsel advocated for her client within the parameters of M.R.P.C. 3.1, 3.3 and 3.4. I can find no basis for the State's criticism here.

13

Secondly, it is the litigants in our system of justice that are entitled to due process and to fundamental fairness, not the trial judge. Indeed, the trial judge is supposed to make sure that each litigant is accorded procedural and substantive due process and that the law is followed. And, finally, instead of railing on the OSPD, the Attorney General's training people might take the occasional opportunity to remind prosecutors of what this Court said in *State ex rel. Fletcher v. Dist. Court*, 260 Mont. 410, 415, 859 P.2d 992, 995 (1993). Specifically,

> [t]he prosecutor's role is a unique one within the criminal justice system. Though the [county] attorney must diligently discharge the duty of prosecuting individuals accused of criminal conduct, the prosecutor may not seek victory at the expense of the defendant's constitutional rights. Thus, the prosecution is obligated to respect the defendant's right to a fair and impartial trial in compliance with due process of law. Moreover, the prosecutor may not bring criminal charges against an individual unless supported by probable cause, and, once charges are instituted, must reveal to the court any information which negates the existence of probable cause. . . .
> [T]he role of the prosecutor . . . [is not] simply a specialized version of the duty of any attorney not to overstep the bounds of permissible advocacy . . . . In all his activities, his duties are conditioned by the fact that he is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all . . . . Thus, the prosecutor must execute the duties of his representative office diligently and fairly, avoiding even the appearance of impropriety that might reflect poorly on the state. [Internal quotations and citations omitted.]

While I do not excuse mistakes and sloppy work by the OSPD, I also do not excuse the prosecutor taking advantage of that where the fundamental constitutional rights of parents and the best interests of abused and neglected children are involved. Given the prosecutor's unique obligations as described above and, presumably, greater expertise, trial courts might

14

be dissuaded from heading down the wrong path if the county attorney gave the judge a heads-up warning.

¶30 I appreciate the sort of well-written, well-researched, and well-argued briefs that appellate counsel filed in this case. That she did not prevail is more a function of a losing cause; not for her lack of diligence or admirable effort.

¶31 Quote-worthy, too, is appellate counsel's response in her reply brief to the State's criticism. She stated:

> Finally, the Department's insinuation that "OSPD" intentionally fails to train trial counsel as part of an agency-wide strategy to gain a tactical advantage on appeal is preposterous.[1] Appellate counsel for the mother has an obligation to zealously represent the mother and to raise on her behalf nonfrivolous appellate issues, including claims of plain error by the trial court and ineffective assistance of trial counsel. Appellate counsel does not have the same obligation to ensure the system is "fair" to the district court judge, the child, or the child's foster parents. Moreover, the idea that it is somehow "unfair" to expect district court judges to follow the law is absurd. People make mistakes, even district court judges. It is appellate counsel's job to ensure those mistakes are presented to this Court for review, and it is this Court's job to review them, if circumstances warrant. When the law is plain, the district court nonetheless makes a decision in contravention of that law, and that decision compromises the integrity of the judicial process and affects the mother's fundamental right to parent, appellate counsel has the duty to raise the issue before this Court on appeal, regardless of what trial counsel's position below may have been. The mother contends this is the case here and urges the Court to exercise its inherent power to review these important issues now. [Internal citations omitted.]

I agree.

¶32 With those caveats, I concur.

15

/S/ JAMES C. NELSON

---

[1] As Appellate Counsel also notes, given OSPD's record on appeals in abuse and neglect proceedings since its inception three years ago, had OSPD enacted such a system-wide strategy, it could fairly be deemed a failure at this point.

16