FILED

December 30 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0084

DA 14-0084

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 345

---

IN THE MATTER OF:

S.B.C., Jr.,

    A Youth in Need of Care.

---

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN 11-30
Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Elizabeth Thomas, Elizabeth Cunningham Thomas, PLLC, Missoula,
Montana (for Father)

        Carolynn M. Fagan, Fagan Law Office, P.C., Missoula, Montana
(for Mother)

        Nathan St. Goddard, Blackfeet Indian Reservation of Montana, Browning,
Montana (for Blackfeet Tribe)

    For Appellee:

        Timothy C. Fox, Montana Attorney General; Katie F. Schulz, Assistant
Attorney General; Helena, Montana

        Fred R. VanValkenburg, Missoula County Attorney; Matthew B. Lowy,
Deputy County Attorney, Missoula, Montana

---

Submitted on Briefs:  October 15, 2014
Decided:  December 30, 2014

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 N.B. (Birth Mother) and S.B.C. (Biological Father) appeal from the order entered by the Fourth Judicial District Court, Missoula County, terminating both parents' rights to their minor child, S.B.C., Jr. (S.B.C.), and granting the Department of Public Health and Human Services, Child and Family Services Division (Child Services) permanent legal custody with right to consent to adoption. The Birth Mother and Biological Father also challenge the District Court's order denying transfer of jurisdiction to the Blackfeet Tribal Court. The Blackfeet Tribe (Tribe) has filed a cross-appeal likewise challenging the denial of its motion to transfer jurisdiction to the Blackfeet Tribal Court and the termination of Biological Father's parental rights. We affirm.

¶2 We address the following issues on appeal:

*1. Did the District Court err by denying the Tribe's motion to transfer jurisdiction to the Blackfeet Tribal Court?*

*2. Did the District Court abuse its discretion by terminating Biological Father's parental rights?*

*3. Did the District Court abuse its discretion by terminating Birth Mother's parental rights?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 S.B.C. is a Native American child, whose biological parents are enrolled members of the Blackfeet Tribe. Because of S.B.C.'s ancestry he is considered an "Indian child"

2

under the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1903(4).[1] Birth Mother gave birth to S.B.C. in June 2011. Birth Mother and Biological Father are not married. Biological Father's name did not appear on S.B.C.'s birth certificate and he has not pursued a parental relationship with S.B.C.

¶4 On July 28, 2011, Child Services filed a petition in Missoula County for emergency protective services and temporary investigative authority. Child Services became involved after law enforcement officers were summoned to Birth Mother's residence because Birth Mother's other minor child, S.B.C.'s half-sister, was found naked and unsupervised in the middle of a busy intersection. This was the fourth time in two weeks law enforcement officers had been called to Birth Mother's residence to deal with similar issues. Law enforcement discovered Birth Mother had left the residence and there was no adult to care for S.B.C. Child Services contacted Birth Mother and explained if she did not return home, S.B.C. would be placed in protective care. There was an outstanding arrest warrant for Birth Mother at that time and, when she failed to return home, S.B.C. was removed. He was then 27 days old. Biological Father knew of the removal, but declined to take custody of S.B.C.

¶5 At the time of removal, Child Services consulted with the Blackfeet Tribe's ICWA coordinator, Raquel Vaile, who advised that S.B.C.'s paternal grandparents had expressed an intention to become licensed foster care providers. However, until that

[1] The term "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

3

could be arranged and Title IV-E funding initiated, Vaile asked that Child Services arrange for placement of S.B.C.[2]

¶6    In September 2011, Child Services placed S.B.C. back with Birth Mother. They lived together at Mountain Home (a shelter for homeless mothers and children) for approximately three weeks. Birth Mother voluntarily left Mountain Home because she felt there were too many rules to follow. Within days of leaving, Birth Mother was arrested for her fourth offense of Driving under the Influence of Alcohol. Child Services requested Biological Father to take custody, but he again refused and questioned his paternity. Child Services subsequently set up appointments for Biological Father to establish paternity, but he failed to attend the appointments. Following removal, S.B.C. was temporarily placed in six different residences and with five different primary care providers.

¶7    In October 2011, Vaile met with Sheila Finley, a social worker for Child Services, to discuss more permanent placement options for S.B.C. Vaile explained Biological Father was refusing to care for S.B.C. until paternity was established, she was still assessing the possibility of placing S.B.C. with his paternal grandparents, and that no other kinship placements had yet been identified. Child Services then located a Native American foster parent (Foster Mother) and placed S.B.C. in her care; Foster Mother is an ICWA-qualified foster parent and the adoptive mother of three Native American

---

[2] Title IV-E is an entitlement program authorized under the Social Security Act that provides federal funding to assist states and Indian Tribes in providing foster care, adoption assistance, and kinship caregiver payments for children who meet the program's eligibility criteria. *See* 42 U.S.C. §§ 671-679(b).

4

children. Vaile was advised that Child Services had placed S.B.C. with Foster Mother and approved of the placement on behalf of the Tribe. S.B.C. has been in Foster Mother's care since the placement in October 2011, and Foster Mother wishes to adopt S.B.C.

¶8 In December 2011, the District Court ordered Biological Father to submit to paternity testing. Biological Father eventually submitted and in March 2012 his paternity of S.B.C. was confirmed. Biological Father did not attempt to be a placement option for S.B.C. or visit the child in the nine months following the establishment of paternity.

¶9 In January 2012, the Tribe filed a notice of intervention in the action. On January 24, 2012, the District Court conducted a youth in need of care adjudication hearing. Vaile testified, in her capacity as the Blackfeet Tribe's ICWA coordinator, that she continued to support the placement of S.B.C. with Foster Mother; S.B.C. had "been placed [with Foster Mother] in, complian[ce] with the Indian Child Welfare Act"; there was "clear and convincing evidence that support[ed] that active efforts [had] been engaged in by [Child Services] to prevent the breakup of this Native American family"; and there was "clearing [sic] and convincing evidence that [placing S.B.C. with Birth Mother] would result in serious emotion or physical damage" to S.B.C. as Birth Mother was in custody for DUI. The court adjudicated S.B.C. a youth in need of care.

¶10 On February 29, 2012, the District Court ordered a treatment plan for Birth Mother to address her alcohol addiction and lack of attention and parenting skills in caring for her children. The treatment plan contained several specific requirements,

5

including that Birth Mother successfully complete inpatient treatment; obtain a sober living environment, whether on her own or in a facility like the Carole Graham Home; inform her social worker of her plans for aftercare and obtain her social worker's approval for them; and successfully complete her aftercare.

¶11 On September 28, 2012, Child Services filed a motion to approve a permanency plan. Child Services' primary plan for S.B.C. was reunification with Birth Mother with a concurrent plan for adoption of S.B.C. if reunification failed. In December 2012, after successfully completing her inpatient treatment, Birth Mother enrolled in aftercare at the Carole Graham Home. However, before reunification with S.B.C. could be accomplished, Birth Mother was asked to leave because of her violations of house rules.

¶12 On February 27, 2013, during a status conference on the case, the attorney representing Child Services advised that the State would be pursuing termination of parental rights to S.B.C. The District Court set an initial hearing on the termination issue and all parties were served with a copy of the minute entry and "note of ruling" reflecting this development, including counsel for the Tribe. On March 6, 2013, the State filed a petition to terminate both biological parents' parental rights based on failed treatment plans and the best interests of the child, and also sought legal custody for the purpose of approving adoption of S.B.C. by Foster Mother.

¶13 On April 10, 2013, the Tribe filed a motion to transfer jurisdiction to the Blackfeet Tribal Court. Birth Mother joined the motion, which was opposed by the State. The District Court initially issued an order granting the motion, but rescinded that order after

the State filed an objection indicating it had a right to respond to the motion. The District Court conducted a hearing on the motion on May 14, 2013. The Tribe's new ICWA coordinator, Anna Fisher, testified that she believed S.B.C. should be removed from his current placement and placed within the Tribe. Specifically, Fisher testified S.B.C. should be placed with Biological Father, who she believed would provide care for the child with the assistance of Biological Father's mother. Fisher stated, "I think that, right now, in the best interest of [S.B.C.], I think that he would be better off with his own relatives," and affirmed that Blackfeet culture "does not agree, in any event, of [sic] termination of parental rights." Fisher further opined that Foster Mother was not only unable to properly care for S.B.C., but was also unqualified to raise the other three Native American children she had already adopted because of cultural differences between the children's tribe and the Foster Mother's tribe.[3] When asked by Birth Mother's counsel if she thought "this case should have been transferred to the Blackfeet Tribe a long time ago," Fisher answered, "Yes, I do . . . it was somebody's fault. It fell apart."

---

[3] Fisher so opined during her direct testimony, and then again under cross-examination by the State's counsel:

> Q: It's your position that the foster mother cannot meet the cultural needs of [S.B.C.]?
> A: That's my position, yes.
> Q: And, she can't meet the cultural needs of the three Crow children, that's [sic] she has already adopted, either, correct?
> A: Actually - not.
> Q: You'll have to clarify your answer for me. I didn't understand.
> A: Actually, she can't teach them Crow culture.
> Q: She can, or she cannot?
> A: She cannot.
> Q: Okay. So, she cannot teach her three children, that's [sic] she has adopted, Crow culture, and she can't teach [S.B.C.] Blackfeet culture, right?
> A: No, she cannot.

7

¶14 On June 3, 2013, the District Court issued its findings of facts, conclusions of law, and order denying the request to transfer jurisdiction. The court noted that the transfer motion was filed "547-days after [S.B.C.] was placed in his present foster home," and found that "transfer of jurisdiction to the Tribe at this stage of the State court proceedings would deny the Youth a permanent adoptive home, and the only home he has ever known, and would create a substantial risk of harm to [S.B.C.] and be a detriment to his physical and psychological well-being." The court reasoned that "the disruptive effect of transfer of jurisdiction, just before the termination and adoption proceedings were eminent [sic], to an entirely new court system for rehearings of matters already decided is manifest . . . ." The court concluded that the State has shown good cause to deny the motion seeking transfer of jurisdiction "at this advanced stage of these proceedings," describing the motion as "untimely."

¶15 On July 17, 2013, Biological Father filed a Petition for Supervisory Control to the order denying request to transfer jurisdiction. On August 20, 2013, this Court denied the petition, reasoning that this Court's review of the District Court's good cause determination "does not raise a purely legal question" and therefore was not suited for the exercise of supervisory control.

¶16 On January 15, 2014 the District Court entered its order terminating both biological parents' parental rights and granting legal custody to Child Services with the right to consent to the adoption of S.B.C.

## STANDARD OF REVIEW

8

¶17 We review a district court's findings of fact to determine if they are clearly erroneous. *In re J.W.C.*, 2011 MT 312, ¶ 15, 363 Mont. 85, 265 P.3d 1265. Findings of fact are clearly erroneous if they are not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if we are left with the definite and firm conviction that a mistake has been committed. *In re G.S.*, 2002 MT 245, ¶ 24, 312 Mont. 108, 59 P.3d 1063.

¶18 We review a district court's conclusions of law for correctness. *In re J.W.C.*, ¶ 15 (citation omitted). A district court's application of the law to the facts of a case is a legal conclusion which we review to determine whether the interpretation of the law is correct. *In re J.W.C.*, ¶ 15 (quotations omitted).

¶19 We review for an abuse of discretion a district court's termination of parental rights. *In re J.M.*, 2009 MT 332, ¶ 12, 353 Mont. 64, 218 P.3d 1213. A district court abuses its discretion if it "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re J.M.*, ¶ 12.

¶20 We have not previously stated with particularity the standard of review this Court applies to a district court's determination of "good cause" regarding a motion to transfer jurisdiction to a tribal court. While we exercise de novo review of good cause determinations in certain contexts, *see, e.g.*, *BNSF Ry. Co. v. Cringle*, 2012 MT 143, ¶ 16, 365 Mont. 304, 281 P.3d 203, the good cause determination made pursuant to a motion to transfer is based on the best interests of the child, as further discussed herein.

9

Although the best interest inquiry is somewhat unique in this context, we apply an abuse of discretion standard to best interest determinations when reviewing a district court's termination of parental rights. *See In re M.A.L.*, 2006 MT 299, ¶ 17, 334 Mont. 436, 148 P.3d 606. Under ICWA, "the term 'good cause' was designed to provide state courts with flexibility" in addressing transfer issues. *In re T.S.*, 245 Mont. 242, 246, 801 P.2d 77, 80 (1990) (quotations omitted). Other appellate courts employ an abuse of discretion standard of review for this issue, noting this flexibility. *See, e.g.*, *In the Interest of D.M.*, 2004 SD 90, ¶ 5, 685 N.W.2d 768 (S.D. 2004) ("Denial of a motion to transfer jurisdiction under 25 USC § 1911(b) is reviewed under the abuse of discretion standard.").[4] While a district court's interpretation of ICWA is an issue of law that we review for correctness, *In re J.W.C.*, ¶ 15, a determination of good cause is itself not a purely legal question, as we noted in our denial of supervisory control over this matter. In this context, the good cause decision will be based upon subjective and personal facts regarding a child's best interest. In view of the nature of the issue, the best interest of the child standard, and the acknowledged flexibility given to states under ICWA to resolve transfer determinations, we adopt the abuse of discretion standard.

**DISCUSSION**

¶21  *1. Did the District Court err by denying the Tribe's motion to transfer jurisdiction to the Blackfeet Tribal Court?*

---

[4] *See also*, *In re Zylena R. v. Elise M.*, 284 Neb. 834, 840, 825 N.W.2d 173, 178 (Neb. 2012); *In re Appeal in Maricopa Cnty. Juv. Action No. JS-8287*, 171 Ariz. 104, 828 P.2d 1245, 1248 (Ariz. Ct. App. 1991); *People ex rel. A.T.W.S.*, 899 P.2d 223, 225, 227 (Colo. App. 1994); *In re Welfare of Children of R.M.B.*, 735 N.W.2d 348, 351 (Minn. Ct. App. 2007).

## A. Indian Child Welfare Act and Jurisdiction

¶22    ICWA established "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902.  Congress sought to achieve two goals with the passage of ICWA: (1) "protect the best interests of Indian children," and (2) "promote the stability and security of Indian tribes and families."  25 U.S.C. § 1902.

¶23    At the core of ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. *Miss. Band of Choctaw Indians v. Holyfield*, 109 S. Ct. 1597, 1601, 490 U.S. 30, 36, 104 L. Ed. 2d 29, 38 (1989).  ICWA created a dual jurisdictional scheme for child custody proceedings involving Indian children.  25 U.S.C. § 1911.  Section 1911(a) establishes exclusive jurisdiction within tribal courts for child custody proceedings involving an Indian child "who resides or is domiciled within the reservation."  In contrast, § 1911(b) creates presumptively tribal yet concurrent state jurisdiction over proceedings involving an Indian child who, as in this case, is "not domiciled or residing within the reservation of the Indian child's tribe."  Section 1911(b) further provides that presumptive tribal court jurisdiction may be overcome upon a showing of "good cause to the contrary."[5]  Good cause is not specifically defined within ICWA.

---

[5] 25 U.C.S. § 1911(b) provides in its entirety as follows: "Transfer of proceedings; declination by tribal court.  In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of

## B. Determination of Good Cause

¶24 We have explained, as noted above, that "the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *In re T.S.*, 245 Mont. at 246, 801 P.2d at 80 (citing 44 Fed. Reg. 67584). We have held that, pursuant to this flexibility given to state courts, "the 'best interests of the child' test will be applied in Montana in determining good cause not to transfer jurisdiction of custody proceedings of Indian children under § 1911(b)." *In re T.S.*, 245 Mont. at 247, 801 P.2d at 80 (citing *In re M.E.M.*, 195 Mont. 329, 336, 635 P.2d 1313, 1317, (1981)). We have called this a "jurisdictional 'best interests of the child' test" that "should not be confused with" other best interests of the child tests used in different contexts. *In re T.S.*, 245 Mont. at 247, 801 P.2d at 80. In order to satisfy the jurisdictional best interests of the child test, "the State must provide 'clear and convincing evidence that the best interests of the child would be injured by such a transfer.'" *In re J.W.C.*, 2011 MT 312, ¶ 28, 363 Mont. 85, 265 P.3d 1265 (citing *In re T.S.*, 245 Mont. at 245, 801 P.2d at 79).[6]

¶25 To aid state courts in interpreting and applying ICWA, the Bureau of Indian Affairs has published guidelines, with accompanying commentary, in the Federal Register. *Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed. Reg.

either parent or the Indian custodian or the Indian child's tribe: Provided, that such transfer shall be subject to declination by the tribal court of such tribe."

[6] The Tribe argues that a brief statement made by the District Court during the hearing—"that's the burden I see on the tribe"—demonstrates that the court improperly shifted this burden from the State to the Tribe. However, despite the possible legal error that could be inferred by the statement, it is clear from its written order that the District Court properly required the State to meet this burden.

12

67584-67595 (Nov. 26, 1979) (hereinafter, Guidelines). The Guidelines are "not published as regulations because they are not intended to have binding legislative effect." *In re T.S.*, 245 Mont. at 246, 801 P.2d at 80 (citation omitted). However, the Guidelines are persuasive authority and this Court considers them when interpreting ICWA. *In re C.H.*, 2000 MT 64, ¶ 12, 299 Mont. 62, 997 P.2d 776.

¶26 The Guidelines provide a non-exhaustive list of criteria that may be considered in good cause determinations. Under section (b) of the Guidelines, good cause to deny transfer may exist under any of the following circumstances:

> (i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.
>
> (ii) The Indian child is over twelve years of age and objects to the transfer.
>
> (iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.
>
> (iv) The parents of a child over five years of age are not available and the child has little or no contact with the child's tribe or members of the child's tribe. 44 Fed. Reg. 67591.

The Guidelines also provide that "[s]ocio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists." 44 Fed. Reg. 67591.

## C. The District Court's Denial of Transfer of Jurisdiction

¶27 Birth Mother, Biological Father, and the Tribe advance several arguments challenging the District Court's determination that good cause existed to deny transfer to

Tribal Court. First, they argue the court erred by concluding that the proceeding was in an advanced stage when the Tribe filed the motion for transfer, thereby making the motion untimely. This argument is in reference to subsection b(i) of the Guidelines, which provides that "[g]ood cause not to transfer the proceeding may exist" if the "proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing." 44 Fed. Reg. 67591. This timeliness criterion is "designed to encourage the prompt exercise of the right to petition for transfer in order to avoid unnecessary delays." 44 Fed. Reg. 67591.

¶28 The District Court was careful to acknowledge that nothing in the actual text of ICWA explicitly requires a tribe's transfer motion to be timely, but the Tribe makes a valid point with which we concur: the proceeding had not advanced to a stage that rendered the Tribe's motion, filed about 30 days after the petition for termination, untimely as a matter of law. ICWA does not set concrete timeliness for either tribal intervention or transfer requests. However, ICWA's purposes include sensitivity to delays in requesting transfers to tribal court. The commentary to the Guidelines explains:

> While the Act permits intervention at any point in the proceeding, it does not explicitly authorize transfer requests at any time. Late interventions do not have nearly the disruptive effect on the proceeding that last minute transfers do. . . . Although the Act does not explicitly require transfer petitions to be timely, it does authorize the court to refuse to transfer a case for good cause. When a party who could have petitioned earlier waits until the case is almost complete to ask that it be transferred to another court and retried, good cause exists to deny the request.

14

44 Fed. Reg. 67590.[7,8] We thus consider the circumstances here, including the delay and the potential harm to the child that could occur by granting a transfer at the time the request was made.

¶29 The Tribe received notice of S.B.C.'s placement in foster care and intervened in January 2012. At the time of the Tribe's intervention, the problems identified with the biological parents' ability to care for S.B.C. were readily apparent: Birth Mother had forfeited the care of S.B.C., been arrested for her fourth DUI, and had failed in attempts to reunite with S.B.C.; similarly, Biological Father had denied paternity, refused to voluntarily undergo paternity tests, and exhibited no interest in caring for S.B.C.—leading ultimately to the development of a concurrent plan for adoption of S.B.C. later that year. Given the emergent care situation, and the lack of a tribal option, Child Services located an ICWA-qualified foster home and conferred with the Tribe's representative about this placement, which Vaile approved. S.B.C. went there in October 2011 and progressed well in the care of Foster Mother. The Tribe was

---

[7] The comment's reference to avoiding having a case "retried" is a further demonstration that the Tribe's motion was not untimely as a matter of law. The termination matter here had not yet been "tried."

[8] We acknowledge a split in authority regarding the propriety of considering the time the child spent in foster care in determining whether the proceeding is at an advanced stage. *Compare In re A.B.*, 2003 ND 98, ¶ 18, 663 N.W.2d 625 (N.D. 2003) ("advance stage" determination must separately consider termination proceeding) with *People ex rel. T.E.R.*, 2013 COA 73, ¶ 14, 305 P.3d 414, 417 (Colo. Ct. App. 2013) ("advanced stage" based on considering the time child spent in foster care placement). However, we need not resolve this issue here, as the parties do not argue the point, but rather focus on whether the District Court's good cause determination was supported by sufficient evidence and based on improper considerations. *See City of Billings v. Peterson,* 2004 MT 232, ¶ 45, 322 Mont. 444, 97 P.3d 532 ("It is not this Court's obligation to develop parties' arguments for them.").

15

continually advised and approved of the situation. The Tribe filed a transfer motion in April 2013, 18 months after S.B.C.'s foster care placement, and 15 months after the Tribe intervened. The record does not demonstrate any reason that would have prohibited the Tribe from requesting transfer earlier. Although Fisher's testimony, that things "fell apart," infers that tribal disorganization played a role, those problems, if any, should not accrue against S.B.C. and the permanency he achieved in the meantime. The evidence supports the District Court's conclusion that both the legal proceeding and S.B.C.'s progress in his placement had significantly advanced by the time the Tribe filed its motion to transfer.

¶30 The Tribe next argues the District Court improperly found clear and convincing evidence the best interests of the child would be injured by a transfer to Tribal Court. The commentary to the Guidelines states that the motion for transfer should be prompt and avoid delay because "[l]ong periods of uncertainty concerning the future are generally regarded as harmful to the well-being of children. For that reason, it is especially important to avoid unnecessary delays in child custody proceedings." 44 Fed. Reg. 67591-67592. This Court has likewise stated that "custody of children should be quickly fixed" and "subject[ing] a child to protracted custodial litigation" is harmful to a child's best interests. *In re Matter of D.A.*, 2003 MT 109, ¶ 16, 315 Mont. 340, 68 P.3d 735 (citations omitted).

¶31 The District Court found from testimony that separation from his current placement would be very traumatic for S.B.C. The court found Foster Mother is the only

16

parent he has ever known and that removal would create a substantial risk of harm to him, and be a detriment to his physical and psychological well-being. It found that Foster Mother fully appreciates the laudable goals of ICWA, understands and is capable of helping S.B.C. learn his own heritage, culture and customs, and is willing to travel with him to participate in important tribal activities and rituals unique to his Blackfeet Tribe. The District Court did not err by finding there was clear and convincing evidence that subjecting S.B.C. to another court system and beginning the proceeding anew in Tribal Court would injure S.B.C.'s best interests.

¶32     Lastly, the Tribe argues the District Court improperly considered the socio-economic conditions of the Tribal Court. Subsection (c) of the Guidelines prohibit the consideration of the "[s]ocio-economic conditions and the perceived adequacy" of the tribal court system in making a determination of good cause. 44 Fed. Reg. 67591. In an attempt to demonstrate that the court based its decision on the inadequacy of the Tribal Court system, the Tribe draws our attention to a number of assertions the District Court made in its findings of fact and conclusions of law. The District Court remarked throughout its findings of fact and conclusions of law that the Tribe "chose to sit on its hands and delay seeking jurisdiction over [S.B.C.] for tribal financial reasons." Further, the court insinuated that the Tribe believes its children are sacred "only when it is in its best financial interests to do so."

¶33     We agree that the District Court made comments that were both unnecessary and inappropriate. While the court's financial comments validly reflected the testimony of

Fisher to the extent she testified that the availability of funding necessarily factors into the Tribe's custody decisions, there was no reason to question the Tribe's motives with regard to the sacredness with which it views S.B.C. or other Blackfeet children, or that it "exercise[s] its sovereign rights as a Nation . . . only when it is in its best financial interests to do so." Despite the inappropriateness of some of the court's statements, none were directed at the efficacy of the Blackfeet Tribal Court system itself. We conclude that the statements are not a basis for reversal. We affirm the District Court's denial of the motion for transfer.

¶34     *2.   Did the District Court abuse its discretion by terminating Biological Father's parental rights?*

¶35     Biological Father argues the District Court abused its discretion by terminating his parental rights. Biological Father asserts that there was no "testimony of qualified expert witnesses, that continued custody" of S.B.C. would result in serious damage to the child as is required by ICWA. The State, citing the Supreme Court's decision in *Adoptive Couple v. Baby Girl*, 133 S. Ct. 255, 186 L. Ed. 2d 729 (2013), argues that no qualified expert testimony was required because Biological Father did not ever have custody of S.B.C., as the District Court held.

¶36     Section 1912(f) of ICWA addresses the requisite expert testimony necessary to involuntarily terminate parental rights with respect to Indian children. Specifically, § 1912(f) provides that "no termination of parental rights may be ordered . . . in the absence of . . . *testimony of qualified expert witnesses*, that the *continued custody* of the child by the parent or Indian custodian is likely to result in serious emotional or physical

18

damage to the child." (Emphasis added.) In *Baby Girl*, the Supreme Court held that "§ 1912(f) does not apply in cases where the Indian parent *never* had custody of the Indian child." *Baby Girl*, 133 S. Ct. at 2560, 186 L. Ed. 2d at 740 (emphasis in original). The Supreme Court reasoned the phrase "continued custody" as referenced in § 1912(f) necessarily implies a prior term of "custody that a parent has" or "had at some point in the past" that could be continued. *Baby Girl*, 133 S. Ct. at 2560, 186 L. Ed. 2d at 739. *See also In re J.S.*, 2014 MT 79, ¶ 31, 374 Mont. 329, 321 P.3d 103.

¶37 The record supports the District Court's determination that Biological Father never had custody of S.B.C. Biological Father was given opportunities to exercise custodial rights regarding S.B.C., but he steadfastly was unwilling or unable to do so. Biological Father initially denied paternity and failed to appear for paternity tests. Even after paternity was established by court order, Biological Father did not attempt to be a placement option for S.B.C., did not object to S.B.C.'s placement elsewhere, and in nine months following the establishment of paternity, did not visit S.B.C. While he did have minimal visits with S.B.C., Biological Father testified he "never had [S.B.C.] in [his] care." Given this record, there was never any "custody" by Biological Father that could be continued within the meaning of § 1912(f). Therefore, § 1912(f) is inapplicable and the District Court did not abuse its discretion by terminating Biological Father's parental rights.

¶38 *3. Did the District Court abuse its discretion by terminating Birth Mother's parental rights?*

19

¶39 Birth Mother argues the District Court abused its discretion by terminating her parental rights. Birth Mother offers that there is insufficient evidence to support the District Court's finding that she failed to complete her treatment plan. Pursuant to § 41-3-609(1)(f), MCA, a court may order termination of the parent-child relationship if the child is an adjudicated youth in need of care and both of the following exist: (1) "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful," and (2) "the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time."

¶40 It is undisputed S.B.C. was adjudicated a youth in need of care, and that he had been in foster care for 30 consecutive months. Pursuant to § 41-3-604(1), MCA, "[i]f a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights."

¶41 The treatment plan ordered by the District Court required Birth Mother to address her alcohol addiction issues and lack of parenting skills. The treatment plan listed specific tasks which included, among other things, that Birth Mother achieve a sober living environment, whether on her own or in a facility like the Carole Graham Home; inform her social worker of her plans for aftercare and obtain her social worker's approval for them; and successfully complete her aftercare.

¶42 The record supports the District Court's determination that Birth Mother failed to comply with her treatment plan. Birth Mother did enroll in the Carole Graham Home,

but she was asked to leave because of rules violations. Birth Mother's social worker testified at the termination hearing that Birth Mother still has "an alcohol problem," "warrants are out for her arrest for absconding from probation," and she "failed to last in a structured environment for two weeks." The record indicates Birth Mother was not present at the termination hearing of her parental rights and her whereabouts were unknown. The District Court found that her condition rendered her unfit, unable or unwilling to provide adequate parental care for S.B.C., which condition was unlikely to change within a reasonable time, and that continued custody of S.B.C. by Birth Mother would be harmful to him. Birth Mother's social worker further testified that Birth Mother's parental rights should be terminated "due to two failed reunifications" with S.B.C. and because she is "not invested in developing that relationship with [her] son, and following a treatment plan, successfully."

¶43 There is sufficient evidence to conclude that Birth Mother had not complied with her treatment plan, and it was not successful. Accordingly, we hold that the District Court did not abuse its discretion by terminating Birth Mother's parental rights.

¶44 Affirmed.

/S/ JIM RICE

We concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON

21

Chief Justice Mike McGrath, dissenting.

¶45 I dissent as to Issue 1. I would not reach the remaining issues and would remand this case with instructions to grant the Tribe's motion to transfer jurisdiction to the Blackfeet Tribal Court.

¶46 Congress enacted the Indian Child Welfare Act of 1978 (ICWA) to address the widespread concern over the removal of Indian children from their families. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 1600 (1989). Testimony at the Congressional hearings emphasized the significant impact that removal of Indian children has on the tribe's role as a sovereign community, as well as the future of Native American society and heritage. *Holyfield*, 490 U.S. at 34, 109 S. Ct. at 1601 (citations omitted). ICWA expresses a "clear preference for keeping Indian children with their families, deferring to tribal judgment on matters concerning the custody of tribal children, and placing Indian children who must be removed from their homes within their own families or Indian tribes." *In re C.H.*, 2000 MT 64, ¶ 13, 299 Mont. 62, 997 P.2d 776 (citing 44 Fed. Reg. 67,585-86 (Nov. 26, 1979)). Federal regulations, guidelines, and any rules or statutes governing ICWA should be liberally construed in favor of the preferences. 44 Fed. Reg. 67,586; *In re C.H.*, ¶ 13.

¶47 As the Court correctly notes (Opinion, ¶ 23), this case implicates 25 U.S.C. § 1911(b), which provides for presumptively tribal, but concurrent state, jurisdiction. Under § 1911(b), the State bears the burden of establishing "good cause" to block a transfer to tribal court. 44 Fed. Reg. 67,591; *see also In re J.W.C.,* 2011 MT 312, ¶ 28,

22

363 Mont. 85, 265 P.3d 1265. Although "good cause" is not defined in ICWA, the Bureau of Indian Affairs Guidelines for State Courts ("Guidelines") provide guidance to state courts. Good cause may exist if "the proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing." 44 Fed. Reg. 67,591.

¶48 The purpose of the "advanced stage" rule is to avoid improper manipulation of the system. The Guidelines note that a party should not be permitted to use transfer as a "tactic to wear down the other side by requiring the case be tried twice." 44 Fed. Reg. 67,590. While the Act allows intervention at any point in the proceeding, this guideline suggests that a parent whose rights have been terminated should not be permitted to transfer jurisdiction after the fact.

¶49 I disagree with the majority's analysis of the "advanced stage" guideline. The State filed its termination petition on March 6, 2013. The Tribe, having intervened early in the case, moved to transfer jurisdiction on April 10, 2013, thirty-five days later. The District Court order faulted the Tribe for seeking transfer after "all the critical court proceedings [were] completed and decisions made," yet the District Court had not conducted a hearing nor made a decision to terminate the parents' rights. The hearing was not held until September 10, 2013, and the order of termination was not signed until January 15, 2014, eight months after the motion to transfer was filed. This situation does not implicate the dangers the "advanced stage" rule is designed to protect against and there is no indication of manipulation by any party.

¶50 The majority opinion purports to concur with the Tribe that the case was not at an advanced stage (Opinion, ¶ 28); however, the majority later faults the Tribe for not acting earlier, noting that the case "had significantly advanced by the time the Tribe filed its motion." (Opinion, ¶ 29). Blaming the Tribe for not seeking transfer earlier, when problems with the parents were "readily apparent" (Opinion, ¶ 29), ignores the interests the Tribe sought to protect. The Tribe intervened early in this case, but did not move to transfer until it became clear that the plan to reunite the family would not be accomplished. When it became apparent that the Indian family relationship would likely be terminated, the Tribal interest in adjudicating the case became more significant, as its interest in retaining the child in the Blackfeet community and culture became more critical. This concern was not present prior to the State's motion to terminate the parents' rights. In my view, the good cause standard is not satisfied by the delay in this case.

¶51 In Montana, courts must consider the best interest of the child in its determination of "good cause." *In re T.S.,* 245 Mont. 242, 247, 801 P.2d 77, 80 (1990). However, the "best interest" test used in the ICWA context differs from the "best interest" test used in custody determinations and termination of parental rights cases. *In re T.S.,* 245 Mont. at 247, 801 P.2d at 80 (1990); *see also In re C.H.*, ¶ 29. ICWA "expresses the presumption that it is in an Indian child's best interests to be placed in accordance with the statutory preferences." *In re C.H.*, ¶ 29 (citations omitted).

¶52 The State bears the burden of establishing that a transfer to the tribal court would be against the child's best interest as considered by ICWA. *In re T.S.,* 245 Mont. at 245,

801 P.2d at 79.  Here, however, the District Court improperly shifted the burden to the Tribe, stating:

> that's the burden I see on the tribe, when we start talking- what's the best interest of the child under the ICWA Act.  There's no question that the priority for protecting the Indian heritage is very high.  But, we, also, have the emotional wellbeing of the child, that probably has priority, and that's the burden I see on the Blackfeet Tribe, right now.

¶53 As we stated in *In re Marriage of Skillen*, "ICWA indicates that regardless of the child's residence, tribal courts are uniquely and inherently more qualified than state courts to determine custody in the best interests of an Indian child."  1998 MT 43, ¶ 39, 287 Mont. 399, 956 P.2d 1 (*overruled, in part, on other grounds by Big Spring v. Conway*, 2011 MT 109, 360 Mont. 370, 255 P.3d 121).  There is no reason to believe that the Blackfeet Tribal Court would not fulfill its obligation to S.B.C. and determine what is in his best interest.  The decision to deny the transfer to tribal court reflects an ethnocentric belief that state courts are better situated to determine the best interests of the Indian child and ignores the policy set by the ICWA.

¶54 Certainly, the foster mother must be commended for her generosity and willingness to welcome children into her home.  However, the majority ignores the distinct cultural difference between native communities, the child's interest in being raised in his own culture, and the Blackfeet Tribe's interest in educating its own children.  Moreover, there is no reason to assume that the Tribal Court would automatically discontinue the child's current placement.  The Tribal Court would necessarily need to examine the same factors in deciding the child's best interest as the state court did.

¶55 Finally, I agree with the majority that the District Court's repeated statements that the Tribe "sat on its hands" until it had a financial reason to seek jurisdiction were inappropriate. The BIA Guidelines specifically provide that a state court cannot base the "good cause" determination on "socio-economic conditions and the perceived adequacy of tribal social services or judicial system." 44 Fed. Reg. 67,591. These statements reflect, at best, a refusal to comply with the Guidelines and, at worst, a strong bias against the Tribe and the Tribal judicial system. Such statements have no place in the District Court's order and were highly inappropriate.

¶56 For these reasons, I dissent. The State did not carry its burden of establishing good cause to block the presumptive jurisdiction in favor of the tribal court. The District Court abused its discretion when it failed to grant the Tribe's request to transfer jurisdiction. On remand, the District Court should grant the Tribe's motion to transfer jurisdiction to the Blackfeet Tribal Court.

/S/ MIKE McGRATH

Justice Beth Baker and Justice James Jeremiah Shea join in the dissenting Opinion of Chief Justice McGrath.

/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA